**60 IVY STREET CORPORATION (86–5500), and Coldwell Banker Commercial Group, Inc., (86–5517), Plaintiffs-Appellants,**

v.

**R.C. ALEXANDER and Doris Alexander, Defendants-Appellees.**

Nos. 86–5500, 86–5517.

United States Court of Appeals, Sixth Circuit.

Argued March 9, 1987.

Decided July 13, 1987.

Rehearing Denied Aug. 17, 1987.

Walter H. Crouch (argued) Waller, Landsden, Dortch, Davis, and John B. Carlson, Nashville, Tenn., for plaintiffs-appellants.

Frank Gorrell (argued) Bass, Berry and Sims, John S. Bryant, Nashville, Tenn., for defendants-appellees.

Before LIVELY, Chief Judge; BOGGS, Circuit Judge; and CELEBREZZE, Senior Circuit Judge.

BOGGS, Circuit Judge.

Plaintiff-Appellant 60 Ivy Street Corporation ("Ivy"), a Georgia corporation, sued the Alexanders for specific performance of a contract for sale of land in Tennessee, and Coldwell Banker Commercial Group, Inc. ("Coldwell"), Ivy's agent, sued for its broker's commission due under the contract. Federal jurisdiction is based on diversity of citizenship, and Tennessee law governs. The district court granted the Alexanders' motion for summary judgment, holding that Ivy had rejected the Alexanders' offer and no contract had been created. After reviewing the record, we believe a genuine dispute existed as to the parties' intentions that was material to the question of contract formation. The grant of summary judgment was therefore inappropriate, so we reverse and remand the case to the district court.

This case was one of many that arose out of the land speculation which took place immediately after the announcement that General Motors would locate its automobile factory in Spring Hill, Tennessee. Ivy retained Coldwell to locate land available for purchase in the area. Coldwell found 339 acres of farm land owned by the Alexanders in nearby Williamson County. Ivy presented the Alexanders a written offer to purchase the property for two million dollars plus the brokerage commission or a total of $2,127,660.

The Alexanders rejected that offer by making a counteroffer on July 26, 1985. Ivy was given until August 2, 1985, to accept or reject the counteroffer, after which the offer would expire of not accepted. The Alexanders made the counteroffer by returning Ivy's written offer with several changes and additions made on that document. The basic purchase price was acceptable, but the Alexanders wanted a payment of $1,127,660 cash at close of escrow rather than the $425,000 offered by Ivy. They asked that Ivy increase the earnest money held in escrow from $25,000 to $50,000 by August 2. They required Ivy to provide a corporate resolution acknowledging authority to enter into the contract, also by August 2. They excised language indicating that the closing was conditional upon obtaining zoning approval and water availability. They agreed to accept Ivy's promissory note for the balance of the purchase price secured by a first mortgage and deed of trust in the property, although they required payments in five annual installments, rather than the seven offered by Ivy.

The controversy in this litigation, however, centers around the change made by the Alexanders to the provision for release of land from the seller's lien upon partial payment of the promissory note. Ivy's offer had contained the following language regarding release of land from the lien at any time by payment of $6,700 per acre:

2) *Release of Land From The Lien:*

(i) At any time after closing, Purchaser may have land released from the lien of the First Mortgage and Deed of Trust by payment of a release price of $6,700 per acre. All release price payments shall be applied to the reduction of the principal amount of the promissory note.

(ii) Upon payment of each installment of the Promisory [sic] Note, Purchaser shall be entitled to have released from the lien of the First Mortgage and Deed of Trust one acre for each $6,700.00 of such payment allocated to the reduction of principal.

The Alexanders lined out subsection (i) and replaced it with the following provision requiring the parties to agree to a schedule of release which would protect the seller's interest by providing for subordination of the seller's lien to later mortgages rather than a fee simple release and by releasing the less valuable back acreage before parcels fronting on the highway:

(i) Sellers agree to an overall Schedule of Release which shall be based upon two underlying premises: (1) an agreement of partial subordination of the $1,000,000 vendor's lien to permit up to certain acreage and monetary levels encumbrance of the property through mortgage which will be prior to Sellers and (2) a release scheme of Sellers releasing to purchaser acreage from the rear of the property

moving forward to the front (Columbia Hwy.) of the property accompanied by initial releases sufficient to permit extension of roads and utilities. Sellers attach hereto a proposed Schedule of Release which shall be construed consistent with (1) and (2) recited herein.

The parties agree that a general development plan and Schedule of Release must be agreed upon as part of this contract.

The clause was typewritten except for the last sentence which was handwritten. The counteroffer retained subsection (ii) setting the release price at $6,700 per acre but added a typewritten sentence stating, "but such must be consistent with the Schedule of Release, attached hereto and made a part hereof."

The Alexanders, however, did not attach a schedule of release to the counteroffer. Mr. Glasgow, the Alexanders' attorney, stated in his deposition that they did not have enough information about Ivy's development plans at the July 26 meeting to agree upon a schedule. He stated that it was agreed at this meeting that Mr. Martin, Coldwell's broker and Ivy's agent, would prepare a general development plan and schedule of release by August 2. He stated that it was understood by the parties that the schedule of release had to be agreed upon by August 2 which was evidenced by adding the handwritten sentence stating that "[t]he parties agree that a general development plan and Schedule of Release must be agreed upon as part of this contract."

Ivy disagrees. Martin concedes in his deposition that he agreed to prepare a proposed schedule of release by August 2, but states that it was understood by both parties that this was to be a general conceptual document for discussion purposes only, and not a final proposal. He stated that it was understood that as Ivy had no engineers working on the plan and no soil or topological studies, a week was too short a time to prepare the kind of detailed release schedule usually seen in development plans. Ivy now argues that the parties' intention was to agree upon a schedule of release prior to closing, but that the agree-ment did not have to be reached by August 2. In other words, Ivy argues that the agreement on the schedule of release was a condition subsequent and not a condition precedent to the formation of the contract, so that agreement upon the release schedule was not necessary for it to accept the Alexanders' offer and form a binding contract.

On August 2, Martin and Peter Blum, president of Ivy, met with Glasgow, the Alexanders' attorney, at Glasgow's office. Blum presented the required corporate resolution and the $50,000 earnest money check, although he had not yet signed the check. Martin presented a proposed schedule of release to Glasgow. Martin stated in his deposition that he made clear the schedule was a concept for discussion purposes only, and that Blum said he would accept any reasonable proposal from the Alexanders.

Martin's proposed release schedule divided the property into a front parcel of 139.3 acres, a back parcel consisting of a 91 acre tract and an 89 acre tract, and a reserve parcel of 18 acres. It provided for a release price of $8,200 per acre rather than the $6,700 stated in the original offer. The schedule included a release of 120 acres at closing, 80 acres from the back parcel and 40 from the front parcel, including roads and utility rights of way, and 200 feet of road frontage. The schedule provided that all releases with the exception of the road frontage and right-of-way would be from the back of the property to the front "in the fashion of a venetian blind." Subsequent to closing, the schedule provided for release of 24 acres for each payment of $200,000 in principal, 15 acres from the back parcel and 9 acres from the front parcel. The reserve parcel would be released upon payment of the final installment.

Glasgow left the meeting to take the above documents to Alexander at his office. He returned with a letter on behalf of the Alexanders which he handed to Blum. The letter stated that the Alexanders were rejecting the contract because the proposed release scheme was unac-

ceptable. Their primary objection was the 120 acres to be released in fee at closing, although they also complained of not knowing the exact location of the 200 feet of road frontage. The letter also stated that the legal effectiveness of the corporate resolution was questionable, and that the $50,000 earnest money check was not a cashier's check and was not signed. The letter repeated that the primary objection was the unacceptability of the proposed release schedule and stated that as it was the end of the business day of August 2, the Alexanders considered that they did not have a binding agreement. They stated that they would be happy to review any additional release proposals from Ivy, but that they would be simultaneously considering offers from other buyers.[1]

Blum told Glasgow that he was surprised at the Alexanders' attempt to reject the contract and that as far as he was concerned they had a deal. He asked Glasgow if his clients would be satisfied if he agreed to waive any release of land at closing or even until the entire indebtedness was paid off. Glasgow replied that he would take a written counteroffer back to the Alexanders, but that they still would not be able to close the deal that day. Blum spoke to his lawyer in Atlanta, who advised him that the Alexanders were attempting to repudiate the contract and that he should leave without getting into further arguments with Glasgow.

Ivy sued for either specific performance of the contract or money damages. The district court granted the Alexanders' motion for summary judgment. The court found that Ivy had rejected the Alexanders' offer by presenting a schedule of release which did not conform with the terms of the Alexanders' offer in that it failed to mention subordination of the mortgage lien and provided for both front and back releases instead of back releases only. The court further held that even if the schedule was not a rejection, the Alexanders' letter effectively revoked the offer since no acceptance conforming to the terms of the offer had yet occurred. The court thus found that no contract had been formed and granted summary judgment to the Alexanders.

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In considering a motion for summary judgment, the court must view the facts and all inferences to be drawn therefrom in the light most favorable to the non-moving party. *SEC v. Blavin*, 760 F.2d 706, 710 (6th Cir.1985); *Smith v. Hudson*, 600 F.2d 60, 63 (6th Cir.1979). The moving party has the burden of showing conclusively that no genuine issue of material fact exists. *Smith*, 600 F.2d at 63.

Not every factual dispute between the parties will prevent summary judgment. The disputed facts must be material. They must be facts which, under the substantive law governing the issue, might affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The dispute must also be genuine. The facts must be such that if they were proven at trial a reasonable jury could return a verdict for the non-moving party. *Id.* 106 S.Ct. at 2510. The disputed issue does not have to be resolved conclusively in favor of the non-moving party, but that party is required to present some significant probative evidence which makes it necessary to resolve the parties' differing versions of the dispute at trial. *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 288–89, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968).

The judge's function at the point of summary judgment is limited to determining whether sufficient evidence has been

---

**1.** Ivy argues that the Alexanders were seeking any excuse to get out of the deal because they had received a better offer of $3 million for the property from another party. They accepted this offer either later in the evening on August 2 or early the next morning.

presented to make the issue a proper jury question, and not to judge the evidence and make findings of fact. "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson,* 106 S.Ct. at 2511.

■ We hold that genuine issues of material fact existed and that the district court's grant of summary judgment was inappropriate. Specifically, the district court erred in ruling that the proposed schedule of release was a rejection of the Alexanders' offer. First, the proposed schedule was not so clearly inconsistent with the required terms of the counteroffer as to be, of necessity, a rejection of the offer. The proposed schedule did provide for progressive releases from the back of each parcel to the front, consistent with the requirements of the counteroffer. The alleged inconsistency arises from the division of the property into front and back parcels, the provision for proportionate releases from each parcel rather than releasing all the acreage from the back parcels before releasing any from the front, and the initial release of 120 acres in fee. These proposals are not clearly inconsistent with the terms of the counteroffer. The counteroffer itself allowed for "initial releases sufficient to permit extension of roads and utilities." The Alexanders may not have agreed to the front and back division or the amount of the initial release and were certainly free to decline those proposals, but we are unwilling to find that Martin's proposed schedule was so clearly a rejection of the Alexanders' offer that they are entitled to summary judgment as a matter of law.

The ambiguous nature of the schedule of release proposed by the Alexanders required this type of bargaining back and forth before the parties could reach an agreement on the precise schedule. The Alexanders set out general guidelines for the release schedule in their counteroffer. Martin, deprived of the guidance of the Alexanders' proposed schedule, presented his own proposal, asserting it was for discussion purposes only, which partially complied with these general guidelines, and partially could be thought not to comply. The Alexanders were free to say whether or not the proposal was acceptable for a variety of reasons. The process of bargaining towards an agreement necessitates this kind of back and forth exchange. Blum and Martin clearly indicated to Glasgow that they did not consider their proposed schedule would constitute the final agreement but that they were willing to discuss any reasonable proposals from the Alexanders. Under these circumstances, a court should not step in on summary judgment and declare that an interim proposal on an unclear point such as this one is a rejection of an offer when there is a dispute as to the parties' intentions at the time they began the bargaining process. If contracting parties feared that every false step they took in the bargaining process could be later construed by the courts as a rejection of an offer as a matter of law, the process of hammering out agreements would become slower, more costly, and even more lawyer-ridden than it is now.

The district court also found, however, that even if the proposal was not a rejection of the offer, the Alexanders' letter of rejection was an effective revocation of the offer since no acceptance conforming to the terms of the offer had yet occurred. Again, we find that the grant of the summary judgment motion on this basis was inappropriate because there was a genuine dispute between the parties as to what the terms of the offer actually were and thus whether the offer had been accepted. This dispute was material to the outcome of the suit in that it determined whether or not a binding contract had been formed.

The parties are in dispute as to whether agreement on the schedule of release was a necessary condition to accepting the offer. Ivy argues that an agreement on the precise schedule of release was not necessary for them to accept the Alexanders' offer and enter into a binding contract for the sale of the land, subject to agreement upon a release schedule prior to closing. The Alexanders now state that the release schedule was a condition precedent to the

contract and had to be agreed upon before Ivy could accept their offer.

Each side presented some evidence supporting the conclusion that their understanding was the correct interpretation of the offer. Ivy argues that the language of the counteroffer should be interpreted to provide for agreement on the precise terms of the release schedule after the offer was accepted. They argue that the Alexanders' offer, which contained only general premises regarding the release schedule and did not attach a specific schedule, meant that the Alexanders were offering to agree to the concept of a release schedule but were willing to leave the negotiations as to the precise schedule to be worked out during the time before closing. The Alexanders argue that the last sentence of the schedule of release clause which stated that "[t]he parties agree that a general development plan and Schedule of Release must be agreed upon as part of this contract" meant that the precise release schedule had to be agreed upon before a binding contract could be formed. Ivy argues that the sentence meant that the parties agreed to agree at a later date.

This dispute presented a jury question and was not capable of resolution on a motion for summary judgment. Ivy was not required to show that the issue would be conclusively resolved in its favor at trial, but only to present enough probative evidence that a reasonable jury could find in its favor. *Cities Services*, 391 U.S. at 288–89, 88 S.Ct. at 1592. Ivy presented enough evidence of the discussions between the parties that a reasonable jury could conclude that the parties had agreed that Ivy could accept the Alexanders' offer on August 2 without agreeing on the precise release schedule, form a binding contract, and negotiate the exact terms of the release schedule in the weeks before closing.

■ Furthermore, the question of whether an agreement on the release schedule was necessary before Ivy could accept the Alexanders' offer is a question of the parties' intentions and thus especially inappropriate for resolution on a motion for summary judgment. Summary judgment is seldom appropriate in cases where the parties' intentions or states of mind are crucial elements of the claim because of the likelihood of self-serving testimony and the necessity for the factfinder's credibility determinations. *See Charbonnages de France v. Smith,* 597 F.2d 406, 414–15 (4th Cir.1979).

The district court improperly assumed that an agreement on the schedule of release was necessary before Ivy could accept the Alexanders' offer and found that no acceptance had been manifested before the Alexanders attempted to revoke the offer. The proper approach on a summary judgment motion must be to consider, in the light most favorable to Ivy, the non-moving party, the evidence that agreement upon the release schedule was not necessary for Ivy to accept the Alexanders' offer. Having found that Ivy presented enough evidence to withstand summary judgment on that point, the question simply becomes whether Ivy had manifested acceptance of the Alexanders' offer to sell their property prior to the time of the attempted revocation. Under Tennessee law, acceptance of an offer may be manifested either by formal acceptance, or by actions, conduct, and statements amounting to acceptance. *Yarbrough v. Stiles,* 717 S.W.2d 886, 888 (C.A.Tenn.1986). Ivy's conduct on August 2 can be interpreted to indicate its intention to accept the Alexander's offer. Blum flew from Atlanta to Nashville and drove to Franklin to meet with Glasgow on the afternoon of August 2. He brought with him the increased earnest money check and the required corporate resolution of authority. He also brought with him a copy of the counteroffer on which he had initialled all the changes that the Alexanders had made to Ivy's original offer, a common method of indicating acceptance. These actions were such that a reasonable jury could find that Ivy had manifested acceptance of the offer before the Alexanders attempted to revoke. Summary judgment was thus precluded.

We believe that genuine issues of material fact existed which made the district court's grant of summary judgment inap-

propriate. We therefore REVERSE the summary judgment, and REMAND to the district court for further proceedings consistent with this opinion.