911 F.2d 733
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Cynthia Kelly SIMMONS and the Estate of Paul Edward Simmons,
Plaintiffs-Appellants,
v.
The UNITED PRESIDENTIAL LIFE INSURANCE COMPANY, Defendant-Appellee.
 No. 89-1953.
 United States Court of Appeals, Sixth Circuit.
 Aug. 21, 1990.
 
 Before KRUPANSKY and MILBURN, Circuit Judges, and CONTIE, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 Cynthia Kelly Simmons and the Estate of Paul Edward Simmons ("Appellants") appeal from the district court's order granting United Presidential Life Insurance Company's motions for summary judgment and for rescission of a life insurance policy. For the following reasons, we reverse the district court's order and remand this action to the district court.
 
 I.
 
 2
 On June 24, 1983, Paul Edward Simmons ("Simmons") submitted an application to United Presidential Life Insurance Company ("UPI") for a "Flexible Premium Adjustable Life Policy" called the "All-In-One." Edward W. Grace ("Grace") of Grace & Porta, Associates, was the soliciting insurance agent. UPI issued the "All-In-One" policy (policy number 220189) to Simmons on July 13, 1983. The policy contained a death benefit of $100,000 and a scheduled monthly premium of $40.00.[1] Simmons' "Insured Rate Class" was "Preferred." This "All-In-One" policy provided for flexible premium payments, adjustable death benefits, death benefits payable before the maturity date, and a surrender value payable on the maturity date. Grace sold Cynthia Simmons ("Mrs. Simmons") a similar $50,000 "All-In-One" policy.
 
 
 3
 The Simmons subsequently insured their son, Paul Allen Simmons, for $10,000 under the "All-In-One" policy pursuant to a Child Protection Benefit Rider. Simmons' "All-In-One" policy listed Mrs. Simmons as the primary beneficiary, and Charles Green Simmons, Paul Edward Simmons' father, as contingent beneficiary. Following the birth of their daughter, Aubrey Lynn, in May, 1986, Edward Grace telephoned the Simmons to request a meeting with them to, ostensibly, insure Aubrey under a Child Protection Benefit Rider to Simmons' "All-In-One" policy.
 
 
 4
 Although the parties agree that Grace subsequently met with the Simmons at their home in May, 1986, the parties differ on the events that followed. The appellants argue that Grace "suggested that the Simmons increase the primary insured's death benefit to $200,000 because the Simmons would obtain 'more coverage for the same amount of money.' " Appellants further maintain that Grace "explained that the new policy was a 'continuation' of the policy the Simmons already had." UPI, however, argues that "Paul E. Simmons cancelled his 'All-In-One' policy and purchased another UPI flexible premium adjustable life insurance policy called the '10/20.' "
 
 
 5
 Simmons denied any adverse medical history, moving traffic violations, or smoking history in his 1986 life insurance "application." The "new" "Flexible Premium Adjustable Life Policy" (policy number 253582), "issued" July 21, 1986, insured Simmons' life for $200,000 and cost Simmons $50.00 per month ("Preferred" rate class) following an initial $414 "Lump Sum Payment."[2] Mrs. Simmons similarly changed her $50,000 life insurance coverage to $100,000 coverage.
 
 
 6
 On December 30, 1987, Simmons committed suicide. In January, 1988, Mrs. Simmons submitted a timely claim to UPI for death benefits pursuant to her deceased husband's $200,000 life insurance policy. UPI denied Mrs. Simmons' request for the full death benefit ($200,000) because Paul Simmons had committed suicide within two (2) years of the "10/20" policy's (policy number 253582) effective date. Specifically, Simmons "10/20" policy with UPI provided:
 
 
 7
 Suicide Exclusion: If the Insured commits suicide, while sane or insane, within two years from the Date of Issue, and while this Policy is in force, we will pay a Limited Death Benefit in one sum to the Beneficiary. The Limited Death Benefit will be the amount of premiums paid for this Policy, less any policy debt and less any partial surrenders. There will be a further deduction from the proceeds for the cost of insurance for any other person insured by rider.
 
 
 8
 Accordingly, UPI paid Mrs. Simmons (the primary beneficiary) the limited death benefit of $1,172.13, and paid-up the two $10,000 insurance policies under the terms of the Child Protection Benefit Riders.
 
 
 9
 On December 28, 1988, the appellants filed a declaratory action in Macomb County Circuit Court seeking the $200,000 death benefit under the decedent's life insurance policy with UPI. UPI subsequently removed the action to the United States District Court for the Eastern District of Michigan.
 
 
 10
 On May 31, 1989, the appellants filed a motion for summary judgment on their claim for death benefits. Appellants argued that the two-year suicide exclusion was inapplicable because the 1986 policy was simply a continuation of the 1983 policy, thereby entitling appellants to $100,000 under the terms of the policy as issued in 1983. Alternatively, the appellants argued that the contractual language of the policy was ambiguous and (construing insurance contract ambiguity against the insurer) void, thereby entitling the appellants to $200,000 under the terms of the 1986 policy. Maintaining that the suicide exclusion barred the appellants' claim for full death benefits, UPI filed a cross-motion for summary judgment on June 23, 1989. On July 3, 1989, after Mrs. Simmons admitted, during her deposition, that her husband had smoked half a pack of cigarettes per day, and that he had had moving traffic violations, UPI filed a counterclaim for rescission (of the "10/20" policy) alleging material misrepresentation by Paul Simmons.
 
 
 11
 On July 13, 1989, a hearing was held on the motions for summary judgment. On July 14, 1989, the district court entered a judgment and an order granting UPI's motions for summary judgment and for rescission (voiding policy number 253582), and denied appellants' summary judgment motion. On August 10, 1989, the appellants filed a timely notice of appeal.
 
 II.
 Summary Judgment
 
 12
 Summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56. A district court's grant of summary judgment is reviewed de novo. Pinney Dock & Transp. Co. v. Pennsylvania Cent. Corp., 838 F.2d 1445, 1472 (6th Cir.), cert. denied, 109 S.Ct. 196 (1988). In its review, this court must view all facts and inferences drawn therefrom in the light most favorable to the nonmoving party. 60 Ivy St. Corp. v. Alexander, 822 F.2d 1432, 1435 (6th Cir.1987).
 
 
 13
 The moving party has the burden of conclusively showing that no genuine issue of material fact exists. Id. Nevertheless, in the face of a summary judgment motion the nonmoving party cannot rest on its pleadings, but must come forward with some probative evidence to support its claim. Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); 60 Ivy St. Corp., 822 F.2d at 1435.
 
 
 14
 "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original). The dispute must be genuine and the facts must be such that if they were proven at trial, a reasonable jury could return a verdict for the nonmoving party. 60 Ivy St. Corp., 822 F.2d at 1435. If the disputed evidence "is merely colorable or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50 (citations omitted).
 
 A.
 
 15
 The appellants argue that Paul Edward Simmons merely increased the coverage of his 1983 life insurance policy from $100,000 to $200,000, thereby allowing the appellants to recover $100,000 pursuant to the "original" 1983 policy (policy number 220189). The appellants' contention is factually without merit.
 
 
 16
 Simmons' "All-In-One" policy (policy number 220189) insured Paul Simmons' life for $100,000. This policy was issued on July 13, 1983, and cost Simmons approximately $480.00 per year to maintain. Thereafter, on May 27, 1986, Simmons executed an application to UPI to obtain a "10/20" life insurance policy in lieu of his existing policy. In fact, Simmons applied the $414 cash surrender value from the "All-In-One" policy to the "10/20" policy as an additional premium. The "10/20" policy, issued on July 21, 1986, insured Paul Simmons' life for $200,000 and cost Simmons approximately $600.00 per year to maintain. Comparing the two life insurance policies, it is evident that the "10/20" policy offered twice the life insurance coverage to Simmons while increasing his premiums by only 25% per year. This comparison indicates that the "All-In-One" policy differed from the "10/20" policy in terms of coverage per premium dollar, suggesting that Simmons canceled his "All-In-One" policy to obtain the "10/20" policy in 1986.
 
 
 17
 This finding is supported by documentary evidence presented to the district court. A "1035 Ownership Change" form supplied by UPI, and signed by Simmons on May 28, 1986, provided:
 
 
 18
 The undersigned intends this assignment to be part of an exchange of insurance policies under Internal Revenue Code Section 1035. The undersigned is aware that United Presidential Life Insurance Company intends to surrender this policy for its cash surrender value and specifically authorizes and approves of United Presidential Life Insurance Company's surrendering the policy for its cash surrender value without in any way limiting the rights transferred under this assignment.
 
 
 19
 Furthermore, in a letter sent by UPI to Paul Simmons dated July 22, 1986, the appellee stated: "In response to the 1035 Ownership and Beneficiary Change forms we received on May 30, 1986, the above referenced policy [220189] has been terminated. The cash surrender value of $414.95 has been applied to your new Universal Life Policy No. 253582." Neither Simmons, nor his wife, questioned the accuracy of UPI's policy termination notice when they received it in 1986. Similarly, Simmons did not cancel the $200,000 "10/20" policy during the 20-day trial period offered to insureds by UPI.
 
 
 20
 Furthermore, Larry Stern, the Senior Vice President and Chief Actuary for United Presidential Life Insurance, noted, in his affidavit, many of the technical differences between Simmons' "All-In-One" policy and Simmons' "10/20" policy:
 
 
 21
 Important differences between the "All-In-One" and the "10/20" policies include the specified amount, surrender charges, surrender charge years, premiums, benefits and refund of cost of insurance. The "10/20" policy doubled the specified amount of insurance coverage to $200,000 for approximately the same premium charged by the "All-In-One" policy for $100,000 of insurance coverage. The "10/20" policy's initial surrender charge was higher, but reduced itself to zero in 16 years versus the 25 years required by the "All-In-One" policy. The "10/20" policy also included $10,000 of Child Protection Benefit for each child without supplemental application. Child Protection Benefits required a supplemental application and proof of insurability on the "All-In-One" policy. Finally, the cost of insurance charged in the "10/20" policy was guaranteed to be refunded in the tenth and twentieth years. The "All-In-One" policy did not refund the cost of insurance.
 
 
 22
 In light of the overwhelming evidence, the district court correctly concluded that Paul Simmons canceled his "All-In-One" policy in 1986.
 
 B.
 
 23
 On June 30, 1989, the district court entered an order allowing UPI to file a counterclaim for rescission of the "10/20" policy (policy number 253582) due to Paul Simmons' alleged material misrepresentations in his insurance application. Specifically, UPI alleged that Simmons misrepresented his smoking and traffic violation histories, thereby voiding Simmons' "10/20" policy ab initio. The district court, after hearing arguments from both parties, agreed with UPI's position and rescinded the "10/20" policy due to Simmons' material misrepresentations. For the reasons that follow, we cannot agree with the district court's determination. Furthermore, because the material misrepresentation finding will be determinative of this action, this case must be remanded to the district court for a trial on the merits.
 
 
 24
 On his May 27, 1986 life insurance application, Simmons responded "NO" to the following questions:
 
 
 25
 1. AT ANY TIME DURING THE LAST TWELVE MONTHS, HAS ANY PERSON PROPOSED FOR INSURANCE SMOKED OR USED Cigarettes; Cigars; Pipe; Chewing tobacco; Nicotine chewing gum; Snuff?
 
 
 26
 .............................................................
 
 
 27
 ...................
 
 
 28
 * * *
 
 
 29
 2(h). HAS ANY PERSON PROPOSED FOR INSURANCE been convicted of a moving traffic violation within the past 3 years?
 
 
 30
 UPI now contends, as it persuasively argued in district court, that Mrs. Simmons' deposition testimony "confirmed that her husband was a smoker and that he had been ticketed for speeding within the past three years." Accordingly, UPI argues that Paul Simmons materially misrepresented his insurability, thereby necessitating rescission of the "10/20" life insurance policy issued to Paul Simmons in 1986.
 
 
 31
 Notwithstanding UPI's contention, Mrs. Simmons' deposition testimony simply does not support UPI's argument or the district court's finding:
 
 
 32
 [UPI's attorney]: Did your husband smoke?
 
 
 33
 [Cynthia Simmons]: Yes, he did.
 
 
 34
 [UPI's attorney]: About how much did he smoke, say, in a day?
 
 
 35
 [Cynthia Simmons]: Maybe a half a pack of cigarettes.
 
 
 36
 [UPI's attorney]: Had he ever--did he have any other insurance in force?
 
 
 37
 .............................................................
 
 
 38
 ...................
 
 
 39
 * * *
 
 
 40
 It is evident that no time frame was established regarding Paul Simmons' smoking history. It is quite possible that Simmons' smoking occurred before, or after, the one-year time period relevant to UPI's "10/20" insurance application. Furthermore, Mrs. Simmons' deposition testimony regarding Paul Simmons' alleged driving violations is similarly vague regarding the timing of Simmons' driving violations:
 
 
 41
 [UPI's attorney]: Had he ever lost his license or had it suspended?
 
 
 42
 [Cynthia Simmons]: Not that I'm aware of.
 
 
 43
 [UPI's attorney]: Did he ever have any tickets?
 
 
 44
 [Cynthia Simmons]: Yes. He had tickets.
 
 
 45
 [UPI's attorney]: What kind of tickets did he have, if you know?
 
 
 46
 [Cynthia Simmons]: He had a couple of speeding tickets.
 
 
 47
 [UPI's attorney]: Do you recall when he had those?
 
 
 48
 [Cynthia Simmons]: I know they were pretty close together. I would say '86.
 
 
 49
 Mrs. Simmons' deposition testimony fails to prove any misrepresentation by Paul Simmons on the "10/20" insurance application. Edward Grace's affidavit notes that Grace sold Simmons the "10/20" policy in May, 1986, and the policy took effect on July 21, 1986. Paul Simmons' driving violations clearly could have occurred in late 1986 or in 1987. Furthermore, Cynthia Simmons could be mistaken regarding the nature (i.e., "moving" traffic violations), or the existence, of the traffic violations. Accordingly, the district court erred by relying solely on Mrs. Simmons' equivocal deposition testimony to rescind Paul Simmons' "10/20" life insurance policy. At this juncture it is unclear whether Paul Simmons misrepresented his smoking and driving violation histories. This determination is critical in light of the Michigan Court of Appeals' holding in Travelers Ins. Co. v. Carey, 24 Mich.App. 207 (1970).
 
 
 50
 In Carey, two successive income protection policies were issued to Daniel Carey by Travelers Insurance Company. Comparable to the instant action, Travelers issued the latter insurance policy in 1963 to replace the earlier policy that it had issued to Carey in 1961. After rescinding the 1963 policy due to Carey's material misrepresentations (made without fraud or moral turpitude), the Michigan Court of Appeals reinstated Carey's original policy, including the running of its two-year incontestability provision.
 
 
 51
 In Carey, as in the instant action, the insurer's agent initiated the change in insurance coverage:
 
 
 52
 Prior to January 1, 1963, [Traveler's agent] informed defendant Carey of the impending availability of a more comprehensive policy of disability insurance. Defendant, after conferring with [Traveler's agent] on January 25, 1963, applied for a new disability policy increasing coverage to $250 per month to replace the 1961 policy [$150 per month].
 
 
 53
 Id. at 209. The Michigan Court of Appeals continued:
 
 
 54
 The record shows that, at the time defendant Carey made claim for total disability benefits under the 1963 policy in December, 1963, he had, under the 1961 policy, certain vested valuable interests, by reason of its having been issued effective October 1, 1961, viz.: the expiration of the periods during which Travelers could assert (1) the 14-day exclusionary clause and (2) the 2-year incontestable clause.
 
 
 55
 The testimony revealed that it was Travelers' agent, Mr. Smith, who suggested to defendant that he replace his coverage under the 1961 policy with that of an entirely new policy....
 
 
 56
 Id. at 210-11. The Michigan court further noted:
 
 
 57
 The 1963 policy was a replacement for that issued to defendant Carey in 1961. It is clear from the record that the 1963 policy in fact encompassed the first policy within its terms, since the 1963 policy provided coverage of $150 per month, as did the 1961 policy and, additionally, provided $100 per month increased coverage over the 1961 policy, for a total of $250 in monthly benefits. Travelers' agent chose to write a new policy for defendant Carey in 1963 although the company could have allowed defendant to retain the 1961 policy with the vested rights which had accrued to him under that policy, while issuing, in addition thereto, the second policy with monthly benefits of $100.
 
 
 58
 Id. at 212 (emphasis added). Comparable to Carey, Simmons forfeited his vested rights under the "All-In-One" policy (the two-year contestability period and the suicide exclusion had lapsed) when he terminated the policy in 1986 following the insurance agent's recommendation to change insurance policies. Furthermore, it appears that Simmons forfeited hundreds of dollars (premiums paid to UPI) when he surrendered his "All-In-One" policy in 1986. Due to the factual similarities between Carey and the instant action, the legal analysis applied by the Michigan Court of Appeals in Carey is applicable to the instant appeal.[3]
 
 
 59
 In Carey, the Michigan Court of Appeals held:
 
 
 60
 It is undoubtedly the law that, if a void or voidable contract is substituted for a valid preexisting obligation and the substituted contract is later rescinded, because void or voidable, the preexisting valid contract is restored, as if nothing had happened.
 
 
 61
 Id. at 215 (quoting Indiana Flooring Co. v. Grand Rapids Trust Co., 20 F.2d 63, 65 (6th Cir.1927)). The Michigan court therefore concluded that, absent fraud or moral turpitude, the original insurance policy "was not extinguished and its terms continued to operate including the running of the two-year incontestable period." Travelers Ins. Co. v. Carey, 24 Mich.App. at 217. Furthermore, Daniel Carey was "entitled to credit on the 1961 policy premiums for that money paid to Travelers on the rescinded 1963 contract." Id. at 215.
 
 
 62
 We must therefore determine, in accordance with Carey, whether Simmons' original insurance policy with UPI must be reinstated in light of Simmons' alleged material misrepresentations to UPI regarding his smoking and driving violation histories.
 
 
 63
 Under Michigan law, an insurer is entitled to avoid liability on an insurance policy if the insured made a material misrepresentation that affected either the acceptance of the risk or the hazard assumed by the insurer. Mich.Comp. Laws Ann. Sec. 500.2218 (West 1983); General Am. Life Ins. Co. v. Wojciechowski, 314 Mich. 275, 281 (1946). See also Dick v. John Hancock Mut. Life Ins. Co., 434 F.2d 808, 810 (6th Cir.1970); Dedic v. Prudential Ins. Co. of Am., 14 Mich.App. 274, 276 (1968). An insurance policy may be avoided on the basis of a material misrepresentation that affected the insurer's risk even if no causal relationship existed between the misrepresentation and the loss sustained under the policy. Kula v. Prudential Ins. Co. of Am., 612 F.Supp. 1077, 1079 (E.D.Mich.1985) (citing Wickersham v. John Hancock Mut. Life Ins. Co., 413 Mich. 57, 63-67 (1982)). The insurance company must prove the charge of misrepresentation "with clear and convincing force." Hughes v. John Hancock Mut. Life Ins. Co., 351 Mich. 302, 312 (1958). Furthermore, insurance policy ambiguities must be liberally construed in favor of the insured. See Calhoun v. Auto Club Ins. Ass'n, 177 Mich.App. 85, 90 (1989), appeal denied, 434 Mich. 894 (1990).
 
 
 64
 Because the Michigan courts have not adequately addressed, and resolved, the question of whether smoking and driving violation histories are material representations warranting the rescission of an insurance contract if misrepresented, the district court shall admit "evidence of the practice of the insurer ... with respect to the acceptance or rejection of similar risks...." Dick v. John Hancock Mut. Life Ins. Co., 434 F.2d at 810.
 
 
 65
 Furthermore, in accordance with the Michigan Court of Appeals' holding in Carey, the district court, following remand of the instant action, must determine whether Simmons' alleged misrepresentations were fraudulently made with the intent to deceive UPI. See Travelers Ins. Co. v. Carey, 24 Mich.App. at 212. Good faith "is an issue for the trier of facts under conflicting evidence." Howard v. Golden State Mut. Life Ins. Co., 60 Mich.App. 469, 480 (1975). If the district court determines that Simmons' "10/20" policy should be rescinded, and if the district court further determines that the "All-In-One" policy should be reinstated (pursuant to Carey), Mrs. Simmons would be entitled to $100,000 under the "All-In-One" policy because the contestability and suicide exclusion periods have lapsed.
 
 
 66
 For the aforementioned reasons, the district court's order is reversed and this action is remanded to the district court for a trial on the merits.[4]
 
 
 
 [1]
 The first policy year's premiums consisted of a $316.00 "Lump Sum Payment," and a $163.00 "Minimum 1st Year Annual Premium."
 
 
 [2]
 The $414 was the cash surrender value of Simmons' 1983 life insurance policy
 
 
 [3]
 Despite the appellee's argument to the contrary, we find that the appellants preserved their right to appeal the reinstatement issue by arguing the continued applicability of the $100,000 policy
 
 
 [4]
 This decision does not violate this court's recent holding in Liberty Nat'l Bank & Trust Co. v. Life Ins. Co. of Cincinnati, 901 F.2d 539 (6th Cir.1990):
 What the plaintiffs seek here is a decree ordering rescission of the contract of surrender and reinstatement of the original contract of insurance, subject to payment of the omitted premiums. But such a decree would give the beneficiary substantially more than Mr. Troutman thought he was bargaining for. It would go well beyond what "the ends of justice demand."
 Id. at 547. Liberty Nat'l did not apply Michigan law, involved radically different facts than the instant action, and involved an experienced insurance agent selling policies to himself. Furthermore, rescinding the "10/20" policy, and reinstating the "All-In-One" policy, in the instant action would hardly "go well beyond what 'the ends of justice demand' " and would not give the Simmons more than they bargained for.