951 F.2d 348
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Pauline BOURCIER, Personal Representative of the Estate of
Mark Bulley, Deceased, and James Troyer,
Plaintiffs-Appellants,
v.
UNITED STATES of America, Defendant-Appellee.
 No. 91-1681.
 United States Court of Appeals, Sixth Circuit.
 Dec. 23, 1991.
 
 Before NATHANIEL R. JONES and MILBURN, Circuit Judges; and LIVELY, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 Plaintiffs-appellants Pauline Bourcier, as personal representative of the estate of Mark Bulley, deceased, and James Troyer appeal the grant of summary judgment in favor of the United States of America, defendant-appellee, in this action for wrongful death and personal injuries allegedly resulting from the negligent construction and maintenance by the Army Corps of Engineers of a breakwater pier. On appeal, the principal issues are (1) whether the district court erred in finding that plaintiffs had failed to show the existence of a genuine issue of material fact concerning the defendant's knowledge of an exaggerated and dangerous lake current near its breakwater, and (2) whether the district court erred in finding that defendant's alleged failures to warn of existing lake currents and to provide lifesaving equipment in the vicinity of the breakwater were not proximate causes of plaintiffs' injuries. For the reasons that follow, we affirm.
 
 I.
 
 2
 Plaintiffs brought this action under the Federal Tort Claims Act, 26 U.S.C. §§ 1346, 2671-80, for the drowning death of plaintiff's decedent, Mark Bulley, and the emotional distress allegedly caused to Bulley's swimming companion, James Troyer. On July 17, 1987, Mark Bulley, a sixteen-year-old resident of Manistee, Michigan, went to the First Street Beach and swam from approximately 3:00 p.m. to approximately 5:00 p.m. when he and his companions left the beach. Later that day, at about 6:30 p.m., James Troyer, age seventeen, accompanied Mark Bulley back to the beach to engage in body surfing.
 
 
 3
 Near the First Street Beach, the Army Corps of Engineers owns and maintains a breakwater pier that extends from the beach some distance into the waters of Lake Michigan. The Corps of Engineers owns approximately 100 feet of beach on either side of the breakwater. There is no fence or other demarcation line between the city-owned First Street Beach and the property owned by the Corps of Engineers. Swimming is permitted, and the City of Manistee maintains lifeguards at the beach during certain hours in the summertime. There are signs on the beach showing the limits of the guarded area for swimming and a warning sign when there is no lifeguard on duty. The Corp of Engineers' property is beyond the guarded area, and the Corps maintains a sign near the entrance to the breakwater warning people in the following language: "Insure your safety. Use with caution. KEEP OFF DURING STORMS OR HIGH SEAS."
 
 
 4
 At the time the boys returned to the beach, the waves had risen to the point that they had white caps and were washing over the breakwater. The boys saw no one else on the beach and no swimmers in the water at the time, but they entered the lake next to the breakwater where they body surfed for approximately ten minutes. After a five or ten minute rest on the breakwater, they returned to body surfing. Suddenly, Mark realized that the water was over his head and he panicked. He screamed that he could not swim. James swam to him and tried to pull him to safety, but Mark's struggles prevented the rescue effort, and James was forced to swim back to the breakwater alone. James ran for help.
 
 
 5
 John Anderson, who had been swimming further south on the beach with his daughter, MaryAnn, heard cries of distress and rushed to the breakwater. There he entered the water and attempted to reach Mark, but soon found himself in trouble due to the waves and strong winds. Bystanders threw floating objects into the water, including a milk jug and a small inner tube, but the winds blew these objects beyond the reach of the endangered swimmers. John Anderson was unable to reach Mark, and his heroic efforts cost him his life. He was finally pulled ashore by other rescuers and taken to a local hospital where he was pronounced dead.
 
 
 6
 Chris Batdorf, a Manistee resident, also tried to rescue Mark Bulley. He had been flying a kite near the First Street Beach when he heard screams coming from the area of the breakwater. He rushed to the beach, and, although he saw waves washing over the pier and hitting it with force, he entered the water in an attempt to save Mark. Unable to reach Mark because of the winds and waves, he struggled ashore after almost drowning. A Coast Guard rescue team also arrived at the beach area after John Anderson had been pulled from the lake. The officer in charge, Petty Officer Thomas Rau, refused to permit his men to enter the water because the turbulent conditions of the lake were too dangerous. According to Petty Officer Rau, the prevailing conditions on the lake consisted of waves four to six feet high and winds of fifteen to twenty knots.
 
 
 7
 Three different times on July 17, 1987, the National Weather Service issued a small craft advisory for the area of Lake Michigan that included Manistee. It forecast south to southwest winds ranging from fifteen to thirty knots and waves of three to six feet. The broadcast advised that "persons on or near piers ... breakwaters or beaches are urged to use extreme caution or avoid these areas until waves diminish to a safe height." It is undisputed that there was no lifesaving equipment on the breakwater.
 
 
 8
 The Estate of Mark Bulley, by its personal representative, filed an action in the district court for wrongful death. James Troyer joined the action, claiming injuries from emotional distress. After discovery, the district court granted defendant's motion for summary judgment and, in an opinion accompanying its order, ruled that "there exists no question of fact for trial concerning the Corps' knowledge of an exaggerated lake current existing off its Manistee pier." It also found that, as matters of law, the defendant's alleged negligence in failing to warn the public of dangerous lake currents in the vicinity of the breakwater and failing to provide lifesaving equipment were not proximate causes of plaintiffs' injuries. This timely appeal followed.
 
 II.
 A.
 
 9
 Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. Rule 56, Federal Rules of Civil Procedure. The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). However, in responding to a motion for summary judgment, the nonmoving party may not rest on its pleadings, but must present some "specific facts showing that there is a genuine issue for trial." Id. at 324.
 
 
 10
 "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Id. at 252. "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." Id. at 249-50 (citations omitted).
 
 
 11
 A district court's grant of summary judgment is reviewed de novo in this court. Pinney Dock & Transp. Co. v. Penn Cent. Corp., 838 F.2d 1445, 1472 (6th Cir.), cert. denied, 488 U.S. 880 (1988). In its review, this court will view all facts and the inferences to be drawn therefrom in the light most favorable to the nonmoving party. 60 Ivy St. Corp. v. Alexander, 822 F.2d 1432, 1435 (6th Cir.1987). Finally, our review of the state law applied by a trial judge presiding over a case determined by state law is de novo. Salve Regina College v. Russell, --- U.S. ----, 111 S.Ct. 1217 (1991).
 
 B.
 
 12
 The Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671-80, permits actions to be brought against the United States "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b). The parties agree that the Michigan law governing this case is the Michigan recreational use statute, Mich.Comp.Laws Ann. § 300.201(1) (West Supp.1991), which provides:
 
 
 13
 Except as provided in subsection (3), no cause of action shall arise for injuries to any person who is on the lands of another without paying to the owner, tenant, or lessee of the lands a valuable consideration for the purpose of fishing, hunting, trapping, camping, hiking, sightseeing, motorcycling, snowmobiling, or any other outdoor recreational use, with or without permission, against the owner, tenant, or lessee of the land unless the injuries were caused by the gross negligence or willful and wanton misconduct of the owner, tenant, or lessee.
 
 
 14
 According to the Michigan Supreme Court, the purpose of this act is to "encourage owners of land to make land and water areas available to the public for recreational purposes by limiting their liability toward persons entering thereon for such purposes." Wymer v. Holmes, 429 Mich. 66, 77, 412 N.W.2d 213, 218 (1987). Thus, owners of property are protected from liability unless injuries are caused by their grossly negligent[1] or willful and wanton misconduct.
 
 
 15
 The standard for establishing willful and wanton misconduct is stated in Gibbard v. Cursan, 225 Mich. 311, 322, 196 N.W. 398 (1923). It requires
 
 
 16
 (1) [k]nowledge of a situation requiring the exercise of ordinary care and diligence to avert injury to another; (2) ability to avoid the resulting harm by ordinary care and diligence in the use of the means at hand; (3) the omission to use such care and diligence to avert the threatened danger, when to the ordinary mind it must be apparent that the result is likely to prove disastrous to another.
 
 
 17
 Id. This test has been recognized as the appropriate test for use in cases under the Michigan recreational use statute. Burnett v. City of Adrian, 414 Mich. 448, 326 N.W.2d 810 (1982). Yet, although the court applied the Gibbard standard in Burnett, it appears that a majority of the court criticized the standard as "poorly stated," 326 N.W.2d at 811, because it is couched in terms too similar to those used to define ordinary negligence. Willful and wanton conduct, according to the court, should mean intentional conduct or such an indifference to a known threat of harm as is tantamount to a willingness that it occur.
 
 
 18
 There are two opinions filed in the Burnett case, however, and it is difficult to determine whether the old Gibbard standard has been modified by that case. It can be said that the Michigan Court of Appeals thinks so, for in James v. Leco Corp., 170 Mich.App. 184, 427 N.W.2d 920, 925 (1988), the court stated:
 
 
 19
 The Burnett Court clarified the Gibbard test, stating that willful and wanton misconduct is made out only if the conduct alleged shows an intent to harm or such indifference to whether harm will result as to be the equivalent of a willingness that it does occur.
 
 
 20
 Using the Gibbard standard without apparent modification, the district court found that plaintiff had produced no evidence to show that the United States had knowledge of a dangerously exaggerated lake current existing off or near the Manistee breakwater. Accordingly, it found that plaintiffs could not establish the first element of the Gibbard standard--that defendant knew of a dangerous situation at its breakwater.
 
 
 21
 Plaintiffs argue that a genuine issue of fact concerning the knowledge component of the Gibbard test was made out by the deposition testimony of Dr. Guy Meadows, a marine scientist and professor of naval architecture and marine engineering at the University of Michigan, who read into the record certain portions of a 1976 study by the Corps of Engineers (referred to by the parties as a "Section 111" study) concerning currents in the Manistee harbor and two other Michigan harbors. The study was not itself admitted into evidence, and the district court had before it only the portions which were referred to by Dr. Meadows in his deposition. In that deposition he was asked to point to the parts of the Section 111 study that were relevant to the lawsuit, and in response he identified five short passages which dealt mainly with erosion and sedimentation. In those passages, there is no mention, much less discussion, of dangerous or exaggerated currents around the breakwater. Moreover, there is nothing even to suggest the existence of currents dangerous to swimmers.
 
 
 22
 Plaintiffs also argue that Dr. Meadows' opinions, given in his deposition testimony, established that the defendant must have known of dangerous currents existing in the vicinity of its breakwater. Dr. Meadows believed this to be the case because it is common knowledge among hydrodynamicists that harbor structures affect existing currents. As he stated in his deposition:
 
 
 23
 I believe that both the Corps of Engineers as well as the City of Manistee were aware that strong currents existed in the vicinity of that structure; and that those currents were probably not common knowledge to an untrained or an unexperience (sic) observer and that they posed a hidden danger ... Because in their Section 111 studies for Manistee, as well as for other harbors on Lake Michigan, they very clearly delineate the fact that these currents exist along the shoreline, and that they are modified by the harbor structure themselves.
 
 
 24
 Brief of Appellant at 16.
 
 
 25
 Nothing in this testimony, however, demonstrates that defendant was, or should have been, aware of dangerously strong currents in the vicinity of its breakwater. Certainly currents exist throughout Lake Michigan, and these may be modified by structures jutting out into them. That fact, however, is no indicator of danger such as would, in the words of the Gibbard test, be "likely to prove disastrous to another."
 
 
 26
 Moreover, while Dr. Meadows stated in his deposition that the breakwater must greatly exaggerate the lake currents, he also admitted that he had not studied the lake currents in Manistee harbor, and, therefore, he was unable to express any opinion concerning the degree to which the particular breakwater affected naturally occurring lake currents. Indeed, Dr. Meadows estimated that he would need a thirty-hour study to determine the effect of the breakwater on the natural currents within the harbor.
 
 
 27
 It must be concluded that Dr. Meadows does not know whether the particular breakwater involved in this case produces dangerous currents in its vicinity or what weather conditions might cause it to do so. As the district court found, Dr. Meadows' deposition testimony presents nothing more than speculation that a dangerous current existed and that defendant knew about it. This was simply not enough to raise a genuine issue of material fact concerning defendant's knowledge of a dangerous situation that would likely prove disastrous to another.
 
 
 28
 Plaintiffs also argue that defendant must have known of the dangerous currents in the vicinity of the breakwater because, in 1986, a fisherman drowned when he was swept off the breakwater by high seas. The fact that a person drowned in the vicinity of the breakwater is no evidence that highly dangerous currents generated by the structure caused the death. Drownings in Lake Michigan occur with some frequency and are not unusual. It is unreasonable to draw the conclusion that this incident in 1986 could have put defendant on notice that dangerous and exaggerated lake currents existed near the Manistee breakwater.
 
 
 29
 Plaintiffs next contend that Harmon v. Billings Bench Water Users Ass'n, 765 F.2d 1464 (9th Cir.1985), is analogous to this case. In that case, plaintiffs filed an action to recover for the drowning death of their son and alleged the defendant's duty to refrain from willful and wanton negligence. The facts showed that at least four other children had drowned in the same irrigation ditch that took the life of plaintiff's decedent, and the Ninth Circuit reversed the district court's grant of summary judgment in favor of defendants because "the record arguably supports an inference that the Association acted with indifference toward the danger of children drowning...." Id. at 1468. Harmon was decided before the Supreme Court issued its opinions in Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986), Celotex Corp. v. Catrett, 477 U.S. 317 (1986), and Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574 (1986), and thus may have applied standards somewhat different from those that now prevail. Furthermore, the fact that five children drowned in a particular irrigation ditch is much stronger evidence of a dangerous situation than the single previous drowning in this case. Harmon is not analogous and should not control this case.
 
 
 30
 Plaintiffs also argue that defendant "never raised the issue of its alleged lack of knowledge of an exaggerated undertow and never alleged that it was unaware of the 1986 drowning death at its site." Brief of Appellant at 20. Defendant argued in the district court that plaintiffs could demonstrate no duty owed them by the defendant, J.A. 92, an argument that raises the issue of whether the first element of the Gibbard test has been met--"Knowledge of a situation requiring the exercise of ordinary care and diligence to avert injury to another...." Without the requisite knowledge, no duty is owed. This is enough to raise a question about this gap in the proof, and the district court was correct in addressing it.
 
 
 31
 Finally, plaintiffs cite Croley v. Matson Navigation Co., 434 F.2d 73 (5th Cir.1970), and Burnett v. City of Adrian, 414 Mich. 448, 326 N.W.2d 810 (1982), for the proposition that summary judgment should never be granted in cases involving a particular knowledge on the part of the defendant. In Croley, decided long before the United States Supreme Court's important summary judgment cases of 1986, the Fifth Circuit reasoned that it should be cautious in granting motions for summary judgment where state of mind is at issue because credibility determinations are often important. Knowledge, not credibility, is the issue in this case. The issues are whether there is any evidence showing (1) a dangerous or exaggerated current near the breakwater, and (2) defendant's knowledge of it. Plaintiffs' proof was deficient in both respects.
 
 
 32
 Burnett is also distinguishable. Although the court held that "summary judgment is almost always inappropriate in this type of case," 326 N.W.2d at 822, and the plaintiffs had alleged willful and wanton misconduct in that case, the issue in Burnett was whether the motion for summary judgment for failure to plead an actionable claim should have been granted. Thus, the court looked only at the factual allegations in plaintiffs' complaint to determine whether plaintiffs had stated a claim for willful and wanton misconduct. It was simply discussing a different kind of "summary judgment." When matters go beyond mere pleadings, however, as they do in the present case, summary judgment is perfectly appropriate if gaps appear in the plaintiffs' proof such that their case cannot be proven.
 
 
 33
 The failure of the plaintiffs to show that an exaggerated and dangerous current existed by virtue of defendant's breakwater and their failure to show that defendant should have known of such a situation means they cannot prove the first element of the Gibbard test for willful and wanton misconduct--knowledge of a dangerous situation. In light of those failures, we conclude the district court was correct in granting summary judgment to the defendant. Thus, it is not necessary for us to address the proximate cause issue raised by the plaintiffs.
 
 III.
 
 34
 For the foregoing reasons, the summary judgment granted by the district court is AFFIRMED.
 
 
 
 [1]
 Because of Michigan's particular definition of "gross negligence," the district court held that plaintiffs had not properly pled it. Plaintiffs state that this ruling is not being appealed and concede that "the lower court properly focused upon willful [and] wanton misconduct...." Brief of Appellants at 21