Joshua **MASSEY, et al., Joseph Labay, et al., Brian Devericks, et al.,** Plaintiffs,

v.

**AKRON CITY BOARD OF EDUCATION, et al.,** Defendants.

Nos. 5:99–CV–1350, 5:99–CV–1351, 5:99–CV–1996.

United States District Court, N.D. Ohio, Eastern Division.

Jan. 19, 2000.

---

Jack Landskroner, William Lucas, Landskroner Law Firm, Cleveland, OH, for plaintiffs.

Michelle P. Stronczer, Arter & Hadden, Susan Snyder McGown, Matthew John Markling, Means, Bichimer, Burkholder & Baker, Cleveland, OH, Donald J. Malarcik, Jr., Mentzer, Vuillemin & Mygrant, Akron, OH, for defendants.

## OPINION AND ORDER

GWIN, District Judge.

In these consolidated cases, the Defendant, Akron City Board of Education ("Akron Board of Education"), moves this Court for summary judgment.[1] In each of these cases, the plaintiffs bring an action under 42 U.S.C. § 1983 and say the Defendant Akron Board of Education violated their civil rights under color of state law. The plaintiffs say their rights were violated when the Akron Board adopted customs and practices that allowed Akron Board of Education employee William Bennett to sexually abuse or harass each of the plaintiff minor children.[2] On May 24, 1999, Defendant Bennett pled guilty to five counts of sexual battery and four counts of telephone harassment.[3] The Summit County, Ohio, Court sentenced him to prison.

Alternatively, plaintiffs make claim under Title IX of the Educational Amendment of 1972 as amended, 20 U.S.C.

---

1. All parties filed their respective motions on December 13, 1999. *See* Case No. 5:99–CV–1350, Doc. 61; Case No. 5:99–CV–1351, Doc. 58; Case No. 5:99–CV–1996, Doc. 20.

2. The plaintiffs sue the Board as an entity, not its individual members. Plaintiffs also sue William Bennett, a counselor for the defendant school system. Only the Board has filed for summary judgment.

3. Summit County, Ohio, Case No. C.R. 99020367.

§ 1681 *et seq.* With this claim, plaintiffs say Defendant Akron Board of Education had knowledge of Bennett's improper conduct and was deliberately indifferent to Bennett's sexual abuse and sexual harassment.

The plaintiffs also make pendent state law claims for negligence, negligent hiring, negligent infliction of emotional distress, stalking/harassment, and for loss of consortium.

With its motion for summary judgment, Defendant Akron Board of Education says there is insufficient evidence to support plaintiffs' claims under 42 U.S.C. § 1983 or Title IX. Defendant Board of Education also claims immunity from plaintiffs' state law claims.

For the reasons that follow, the Court denies Defendant Akron Board of Education's motion for summary judgment as to each of the plaintiffs.

## I. BACKGROUND

As to plaintiffs' Title IX claim, the Court considers whether the plaintiffs show sufficient evidence of actual knowledge and deliberate indifference to sexually discriminatory conduct. As to plaintiffs' § 1983 claim, the Court considers whether sufficient evidence shows a deprivation of a constitutional right and that the School Board is responsible for that violation. *See Doe v. Claiborne County, Tenn.*, 103 F.3d 495, 505 (6th Cir.1996). In ruling on whether Defendant Board of Education is responsible for a violation of the plaintiffs' constitutional rights, the Court decides if sufficient facts show that the School Board itself is the wrongdoer. To decide this, this Court considers whether the School Board tolerated a custom or condition that led to William Bennett abusing the plaintiffs.

To support its claim under Title IX that the Board of Education had knowledge of William Bennett's sexual conduct and tolerated it, the plaintiffs show a long history of Bennett's conduct suggestive of pedophilia towards boys and young men.

In 1983, Bennett obtained employment as a teacher in Collinsville, Virginia. Shortly after Bennett was hired, the Collinsville Superintendent received a complaint from the parent of a young male child. The parent complained that Bennett had taken the nine-year-old boy in his car to an isolated area for three quarters of an hour from approximately 8 to 9 o'clock p.m. After this incident, Bennett changed his church and other activities to facilitate contact with the child. For example, the parent complained that Bennett positioned himself immediately behind the young boy in church.

Upon receiving this information, the Virginia Superintendent removed Bennett from direct contact with children. After speaking with Bennett, the Superintendent believed Bennett was "potentially a child molester." The Superintendent "felt that there was a clear and present danger that [Defendant] Bennett might very well be a child molester and [he] was not about to take any type of risk with him."

Shortly after the Virginia incident, William Bennett came to Akron, where he had grown up. Bennett made application for a teaching position with Defendant Akron Board of Education.

After receiving an application for employment as a teacher, the Akron Board of Education's general practice was to secure a reference from the teacher's current employer. The Akron Board typically made this inquiry because a background check is important to secure the safety of the students.

In Bennett's case, the Akron Board of Education made no inquiry to the Collinsville School District or its Superintendent. The Defendant Akron Board of Education did not ask Bennett's most recent employer, Collinsville, if Bennett engaged in any inappropriate conduct while teaching at the Collinsville District. Instead, the Defendant Akron Board of Education hired Bennett in April 1985 as a substitute teacher for the Akron City Schools.

After Bennett completed a short period of substitute teaching, the Board hired him on August 5, 1985, as a full time elementary school teacher at the David Hill School. In this position, Bennett taught students with learning disabilities.

Soon after hiring Bennett as a full-time teacher, the Principal of David Hill Elementary, Barbara Whaley, received a complaint from a student's parent. That parent complained that Defendant Bennett had been following her son into the bathroom and inappropriately watched and talked to him while he was going to the bathroom. The mother reported that Bennett was putting his hands "on the front of the boy's pants and rubbed the child on his buttocks."

The mother further indicated that Bennett had visited the boy at the boy's home and remarked in front of his mother that (1) he had "a nice body for a nine year old"; (2) the child was "wonderfully built"; (3) Defendant Bennett had to watch what he said "because teachers get accused of things"; and (4) the child was "an attractive boy and he will have to be careful with girls."

Principal Whaley sent a memo to Eugene Domonic, then the Assistant Superintendent for the Akron School Board, detailing the accusations against Bennett. Domonic and Whaley then spoke to Bennett.

Defendant Bennett denied sexual wrongdoings. However, Bennett admitted following the boy into the bathroom, he admitted telling the boy's mother that the boy "had a nice body, that he was attractive, that he had a wonderful build and that teachers have to be careful of what they said because they get accused of things." Despite Bennett's statement, the Akron Board of Education took no action to remove Bennett from contact with students. Apparently, the Board of Education declined to remove Bennett because the Akron Police Department found the allegations inconclusive. The Defendant Akron Board of Education continued to allow Bennett to have direct contact with young boys.

Principal Whaley described what effect these complaints and Bennett's admissions should have had:

Q. In spite of what Mr. Bennett told you. The comments themselves, as the comments speak for themselves, and the admission that Mr. Bennett made these statements, do you find those to be inappropriate statements, or do you find these statements are acceptable?

\* \* \* \* \* \*

A. If it was me and I was at the parent's house, I would be speaking about his academic progress. It wouldn't make me any difference what he [the boy] looked like.

\* \* \* \* \* \*

Q. That's right. But as Mr. Bennett's supervisor and hearing that he made these statements, did you find these statements to be inappropriate, no matter what context Mr. Bennett put them in?

A. Yes.

Whaley Deposition, p. 42.

After Principal Whaley spoke with Bennett, the parent again complained that Bennett had reacted to the complaint by grabbing the nine-year-old boy by the hair and pulling him out of his chair. The mother also indicated that Bennett's earlier conduct had involved putting his hands down the child's pants. Again the Akron Board of Education did nothing.

On November 26, 1985, Director of Professional Employment Charles Maggio called the Superintendent of the Virginia school system where Bennett taught before coming to Akron. The Superintendent, Dr. Poore, described the incident that had occurred in Virginia the year before and the actions he had taken in response. He told the Akron administrator that "in no way would [he] ever employ [Defendant Bennett] back as a teacher or to work with young people." Dr. Poore

shared his opinion that "[Defendant Bennett] was a threat to young people and that [he] thought he should not be working with young people." Dr. Poore did not "hold anything back" from the administrator.

The Akron Board of Education did not remove Bennett from contact with students. Instead, it reprimanded him but continued to allow him to teach.

On August 19, 1996, the Defendant appointed Defendant Bennett a counselor at Firestone High School. While serving as a counselor at Firestone, Bennett counseled Plaintiff Joshua Massey, a freshman at the time. Soon after their first counseling session, Defendant Bennett engaged Plaintiff Massey in a lengthy homosexual relationship.

During this relationship, Massey told several of his friends about his sexual activity with Bennett. In March 1997, two female students told a police officer that Plaintiff Massey might have had sex with Bennett. Firestone High School Principal Cynthia Wheeler was told of this allegation.

After receiving this report, Principal Wheeler spoke with Massey. Massey, a young man who feared exposing his sexual orientation, denied any sexual involvement with Bennett. Plaintiff Massey testified why he denied the relation:

A All I knew is that if I admitted it, people were going to find out, and admitting it was going to admit that I was gay, that I was—or whatever, I had done those things with Mr. Bennett, and I was trying my hardest to not let anybody know about it.

Massey Deposition at 105. Apparently, the Board of Education made no further investigation and instead relied upon Massey's denial, even though it would have been surprising if he admitted to such a relationship. Massey was then transferred out of Firestone High School to Garfield High School.

During this time, Bennett also made improper advances to Plaintiff Joey Labay. As with Massey, Plaintiff Labay counseled with Bennett. During Bennett's counseling sessions with Labay, Bennett was preoccupied with Labay's sexual issues. Bennett made Labay uncomfortable with his inquires about Labay's personal life, his romantic objects, and "what type of sex I did, if I did anal sex, if I enjoy it, if I have oral sex, if I give oral sex, and like all these questions about sex." Labay Deposition at 25.

Soon after, Bennett began calling Labay's home. Although he did not identify himself, Labay's mother recognized Bennett's voice. In these calls, Bennett commented on Plaintiff Labay's physique and invited Labay to meet him at a mall. After initially declining to meet Bennett, Labay went to a mall and was met by Bennett. Bennett asked to get into Labay's car and again made comments about Labay's clothing and physique.

After this incident, Mrs. Labay called Principal Wheeler and told her about the phone calls and the apparent effort by Bennett to meet Labay at the mall. She also told Wheeler that Bennett touched Labay on his legs at the mall. Plaintiff Labay confirmed this to Wheeler and told Wheeler about Bennett's interest in Plaintiff Labay's sexual activities and preferred sexual positions.

Principal Wheeler then spoke to Harry Jordan, Director of Human Resources for the Akron Board of Education. Wheeler and Jordan then met with Bennett. He denied making a pass at Labay, but admitted to seeing him at the mall and commenting on his clothing. Jordan warned Bennett about inappropriate contact with his students. Again, the Board of Education did not remove Bennett from contact with students.

In July 1998, Principal Wheeler became aware of yet another incident involving Bennett. In this incident, a student told Principal Wheeler that Bennett had approached the student in a parking lot after the senior banquet. Wheeler described the information given by the student:

Mr. Bennett approached the young man in the parking lot and was talking to him about his physique and how he really— how Mr. Bennett really just wanted to be friends, and this student was very uncomfortable. And the student noticed that Mr. Bennett was getting physically excited . . . .

Wheeler Deposition at 30. Bennett also rubbed his hand up and down the boy's back.

Principal Wheeler reported this incident to Sandra Shaw, Director of Pupil Services, and Richard Roberts, who had taken over as the Director of Human Resources. At that meeting, Wheeler was told about the 1985 incidents involving Bennett. Principal Wheeler then asked the officials to remove Bennett from contact with students:

Q. Did you have the opportunity at that time to review his personnel file?

A. It was not there.

Q. Did you make a recommendation to them at that time as to Mr. Bennett's employment?

A. Yes, I did. It was verbal.

Q. What did you tell them?

A. Please, get him out of my building.

Wheeler Deposition at 36.

After receiving the report of Bennett's arousal upon speaking with a student after the senior banquet, Principal Wheeler scheduled another meeting.

At this July 22, 1998 meeting, Defendant Bennett conceded that he was receiving counseling for "sexual orientation" but proclaimed that he was not a "pedophile." In another meeting held on July 22, 1998, Defendant Bennett read a copy of a victim's statement and he did not deny the charges. He only shook his head.

Despite this absence of clear denial by Bennett, the Defendant Akron Board of Education did not remove Bennett from contact with students. Instead, it only issued another reprimand. After this reprimand, Principal Wheeler was angry at the Board of Education's failure to remove Bennett. She renewed her statement of concern that he should not be in contact with students.

On August 21, 1998, Principal Wheeler intercepted a message to her office from Point Park College in Pennsylvania. The message, meant for Bennett, gave Bennett the phone number and room number of a former Firestone High School student attending the college, Plaintiff Brian Devericks. Because there was no reason for Bennett to have Devericks's phone number, Principal Wheeler became immediately concerned.[4]

After learning of this improper contact, Principal Wheeler spoke with Bennett. She told him he was not to contact Devericks. She reported this incident to William Spratt, the Board's Deputy Superintendent.

Despite Wheeler's warning, Bennett continued to contact Plaintiff Devericks. Devericks and his mother complained. They complained about Bennett calling their home as many as three times a day, as confirmed by caller ID. In her written September 28, 1998, complaint, Devericks's mother observed: "[h]e's sick man and needs to be out of school setting."

By October 1, 1998, Plaintiff Devericks had given Defendant Akron Board of Education a tape of a conversation he had secretly recorded with Bennett. In that conversation, Bennett tries to convince

---

**4.** Plaintiff Devericks explains that in Spring 1998, when he was a senior at Firestone High School, Bennett began calling him. Devericks alleges that during these calls, Bennett made it clear he wanted to engage in sexual acts with Devericks. Devericks says he told Bennett he was not interested and asked him to stop calling him. Subsequently, Bennett allegedly called Devericks to his office and made sexual advances to him. Bennett also allegedly continued to call Devericks at home through the end of the 1997–98 school year and the calls became progressively more graphic. It does not appear from the record that Devericks ever reported these incidents to any school officials until August 1998 when Bennett tried to reach Devericks at college.

Devericks to allow Bennett to come to Devericks's home.

Even after this tape was presented, the Defendant Akron Board of Education did not remove Bennett from contact with students.[5] Principal Wheeler described her frustration with this decision:

Q. How did that make you feel?

A. Very frustrated.

Q. Why?

A. Because this person was harming kids, and I felt helpless.

Q. And the Akron School Board was taking no actions to protect these children?

 \* \* \* \* \* \*

A. I'm not aware of any action.

 \* \* \* \* \* \*

Q. As far as you knew, they took absolutely no action to get Mr. Bennett out of the classroom?

A. No.

Wheeler Deposition at 202–04.

In November 1998, Bennett was involved in yet another incident. On this occasion, Bennett went to a student's place of employment. The student had been receiving "odd calls" that the student traced to Firestone High School. After Bennett appeared uninvited at the student's place of work, he had to be told to leave the premises.

In late November 1998, the Defendant Akron Board of Education received another complaint from Plaintiff Devericks's mother. In this communication, Devericks's mother complained that Bennett had continued in his efforts to contact Plaintiff Devericks at college. The calls were sexual in nature. The Board was told of Bennett's efforts to continue contact with Plaintiff Devericks even after Principal Wheeler had ordered Bennett to stop all such contact.

In January 1999, Plaintiff Devericks came to Firestone High School to confront Bennett and to obtain an acknowledgment of his conduct. Principal Wheeler was nearby and Bennett asked her to join his conversation with Devericks. Bennett then told Principal Wheeler that he had made phone calls to Plaintiff Devericks that were not wanted by Devericks. He also told Wheeler that the calls were of a sexual nature.

After hearing this admission, Principal Wheeler undertook a further investigation of Bennett's conduct. In this investigation, another student from Garfield High School described having sexual relations with Bennett from December 1995 through December 1996, including sex acts in school and in his office. Around this time, Plaintiff Massey recanted his earlier denial of a sexual relationship with Bennett. In this recantation, Massey described having continued his sexual relationship with Defendant Bennett after he had left Firestone High School for Garfield High School.

On February 1, 1998, a student described the sexual activity involving the Garfield High School student. Wheeler immediately went to the Board with this information. On February 4, 1999, the Defendant Akron Board of Education finally removed Defendant Bennett from Firestone High School.

## II. DISCUSSION

### A. Legal Standard

Fed.R.Civ.P. 56(c) states the procedure for granting summary judgment and says in pertinent part:

[t]he judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the

---

**5.** In the tape, Bennett tells Plaintiff Devericks: "Well, I don't know, I mean I don't want you to know what you want to do. I wanted to talk and then let nature take its course is what I wanted to do, I mean if I talk too much about it, it just kind of ruins the whole thing."
Plaintiffs' Exh. 57.

moving party is entitled to a judgment as a matter of law.

In considering a motion for summary judgment, the court must view the facts and all inferences to be drawn therefrom in the light most favorable to the non-moving party. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *60 Ivy Street Corp. v. Alexander,* 822 F.2d 1432, 1435 (6th Cir.1987); *SEC v. Blavin,* 760 F.2d 706, 710 (6th Cir.1985). The moving party has the burden of showing conclusively that no genuine issue of material fact exists. *See 60 Ivy Street Corp.,* 822 F.2d at 1435.

Essentially factual disputes about matters essential to adjudication preclude the Court from granting summary judgment. *See id.* But not every factual dispute between the parties will prevent summary judgment. Rather, the disputed facts must be material. They must be facts which, under the substantive law governing the issue, might affect the outcome of the suit. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The factual dispute must also be genuine. The facts must be such that if they were proven at trial a reasonable jury could return a verdict for the non-moving party. *See id.* at 248, 106 S.Ct. 2505. The disputed issue does not have to be resolved conclusively in favor of the non-moving party, but that party is required to present some significant probative evidence which makes it necessary to resolve the parties' differing versions of the dispute at trial. *See 60 Ivy Street,* 822 F.2d at 1435 (citing *First Nat'l Bank of Arizona v. Cities Serv. Co.,* 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Thus, the judge's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue a proper jury question, and not to judge the evidence and make findings of fact. "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *60 Ivy Street,* 822 F.2d at 1436 (quoting *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505).

The Court now reviews the motions with these standards in mind.

### B. Title IX claim

Title IX provides in pertinent part that "[n]o person ... shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Defendant Akron Board of Education receives federal financial assistance.

In *Cannon v. University of Chicago,* 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979), the United States Supreme Court held that Title IX also is enforceable by means of an implied private right of action. A school district can be held liable in damages under Title IX in cases involving a teacher's sexual harassment of a student. *Franklin v. Gwinnett County Public Schools,* 503 U.S. 60, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992). Plaintiff's federal claims are grounded on this judicially-implied private right of action.

In *Gebser v. Lago Vista Independent School District,* 524 U.S. 274, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998), the Court rejected the theories of vicarious liability and agency liability as bases for institutional liability in Title IX teacher/student sexual harassment cases. *See Gebser,* 118 S.Ct. at 1997 ("[W]e conclude that it would 'frustrate the purposes' of Title IX to permit a damages recovery against a school district for a teacher's sexual harassment of a student based on principles of respondeat superior").

The Court held that an educational institution's liability will depend on a show-

ing of actual notice and deliberate indifference. A damages remedy is not applicable under Title IX "unless an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has actual knowledge of discrimination in the recipient's programs and fails adequately to respond." That inadequate response "must amount to deliberate indifference to discrimination." *Gebser v. Lago Vista Independent School District*, 118 S.Ct. at 1999; *Burtner v. Hiram College*, 9 F.Supp.2d 852, 856 (N.D.Ohio 1998).[6]

■ To decide if an employer had actual notice of a hostile environment, the Court examines whether a legally appropriate representative of the employer was aware of facts—via any channel of communication—indicating a hostile environment. For actual notice to exist, an agent of the school must be aware of facts that indicate a likelihood of discrimination.

■ To decide if notice is given, agency principles are used to decide whether a particular employee's knowledge of facts concerning discrimination are imputed to the school district. The knowledge of a supervisor who has remedial power to hire, fire, and discipline an alleged harasser is sufficient.[7] *See Gebser*, 118 S.Ct. at 1999.

■ Defendant Akron Board of Education does not seriously argue that persons receiving notice of Bennett's activities did not have authority to institute corrective measures on the district's behalf; it scarcely could. On November 8, 1985, an Akron Board of Education principal supervising Bennett received a phone call complaining of actions suggestive of pedophilia. Within a short time, Akron Board of Education Director of Professional Employment Charles Maggio spoke with Dr. Poore in Virginia. Dr. Poore gave the Akron Board notice of Bennett's highly unusual conduct in Virginia.

In March 1997, the high school principal supervising Bennett was told that Bennett was involved in a homosexual relationship with a freshman student. Although the student denied the relation, he did so knowing he faced great exposure if he confirmed the relationship. This same principal then received notice of numerous other incidents of harassment or abuse.

This same principal then received notice of complaints relating to Joey Labay. Labay's mother complained to Bennett's principal that Bennett was continually calling her home seeking to speak to her child. She complained that Bennett commented on Plaintiff Labay's physique and invited him to meet him at a mall. She complained to the principal that Bennett asked to get into her child's car. She also told the principal that in counseling sessions Bennett had great interest in Labay's sexual activities and preferred sexual positions.

As to plaintiff Devericks, Principal Wheeler had notice of Bennett's efforts to contact Devericks. She also knew, from Devericks's mother, that Bennett had been continually calling their home and that these calls were sexual in nature. The Board of Education cannot plausibly argue that it did not have knowledge of Bennett's conduct towards Devericks.

The plaintiffs show other evidence supporting knowledge of this conduct by persons with authority to institute corrective measures on the district's behalf. As to plaintiffs Labay and Devericks, both gave

---

**6.** The majority in *Gebser* was explicit that its holding did not "affect any right of recovery that an individual may have against a school district as a matter of state law or against the teacher in his individual capacity under state law or under 42 U.S.C. § 1983." *Gebser*, 118 S.Ct. at 2000.

**7.** A school also receives notice when notice is given to any employee whom the school has designated to respond to harassment complaints. For cases discussing this rule in the employment context, see *Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 64 (2nd Cir.1998); *Williamson v. City of Houston*, 148 F.3d 462, 466 (5th Cir.1998); and *Bonenberger v. Plymouth Township*, 132 F.3d 20, 27 n. 7 (3rd Cir.1997).

notice to representatives of the Akron Board of Education who had authority to remove Bennett from contact with students. The Board of Education did not keep Bennett from contact with students despite a number of similar complaints.

As to Plaintiff Massey, the Board of Education had less direct notice of problems. But it still had notice of a number of incidents suggestive of a relationship between Bennett and Massey. Most obvious, Massey had apparently told selected friends that he was engaged in a homosexual relationship with Bennett. The Board of Education provides no evidence raising suspicion about why Massey would describe such a relationship to his friends, unless it was true. More important, the Board received notice regarding Bennett's proclivities long before the incidents with Massey occurred.

█ While Defendant Akron Board of Education seems to concede that persons with authority learned of complaints regarding Bennett, it argues that the information was insufficient to give notice. While little authority discusses this element of the *Gebser* decision, similar issues have been examined in the employment discrimination context. In the employment context, an employer can be held liable for discrimination when an employee other than the one harassed reports incidents to an employer representative. *See Dees v. Johnson Controls World Servs.,* 168 F.3d 417, 421–22 (11th Cir.1999); *Varner v. National Super Markets, Inc.,* 94 F.3d 1209, 1213 (8th Cir.1996); *see also Garcia v. ANR Freight System, Inc.,* 942 F.Supp. 351, 356–57 (N.D.Ohio) (granting summary judgment to defendant employer after plaintiff failed to show employer knew of an employee's propensity to harass).

The facts described raise a genuine issue whether the Defendant Akron Board of Education had actual knowledge of Bennett's wrongful conduct and was deliberately indifferent to it.

### C. § 1983 claim

The plaintiffs make claim under 42 U.S.C. § 1983. To make a claim for damages under 42 U.S.C. § 1983, a plaintiff needs to show (1) a deprivation of a federal right (2) committed by an individual acting under color of law. *See Collins v. City of Harker Heights,* 503 U.S. 115, 120, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992); *Gomez v. Toledo,* 446 U.S. 635, 640, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980).

█ The text of the statute creates a damages remedy against every state official for the violation of any person's federal constitutional or statutory rights.[8] A municipality can be held liable if the injury is the product of an official policy or decision by a policy-making official. *See Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Pembaur v. Cincinnati,* 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986).

█ To make out a claim under § 1983 against a state political subdivision, a party must show violation of a constitutional right and show that the violation was committed by one acting under color of state law.

█ Schoolchildren have a constitutional right to personal security and to bodily integrity. This right, which is protected under substantive component of due process clause, includes the right to be free from sexual abuse at the hands of public school employees. *See Kallstrom v. City of Columbus,* 136 F.3d 1055, 1062 (6th Cir.1998); *Doe v. Claiborne County,*

---

**8.** Title 42 U.S.C. § 1983 provides:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ...."

*Tenn.*, 103 F.3d 495, 506 (6th Cir.1996). The plaintiffs show evidence of a clear violation of constitutional rights by Bennett.

Also, Defendant Bennett was clearly acting "under color of law" when he violated plaintiffs' guarantees of due process in this regard. Bennett's contact with the plaintiffs came only from his position as a teacher/counselor.[9] But the plaintiffs must show more to sustain a cause of action against Defendant Akron Board of Education.

A board of education can be liable for damages for violating another's civil rights, but only if the school board itself caused the constitutional violation. In *Monell,* the U.S. Supreme Court held that local government bodies can be sued directly under § 1983, but they cannot be held liable under the doctrine of respondeat superior. *See id.* at 694, 98 S.Ct. 2018; *Adkins v. Board of Education of Magoffin County,* 982 F.2d 952, 957 (6th Cir.1993). A local governmental entity may be held liable under 42 U.S.C. § 1983 for violations of federal law committed pursuant to a governmental "policy or custom." *See Monell,* 436 U.S. at 694, 98 S.Ct. 2018. A school district is a local governmental entity. *See Lopez v. Houston Ind. Sch. Dist.,* 817 F.2d 351, 353 (5th Cir.1987). It logically follows that a school board is also a local governmental entity.

Under *Monell,* the plaintiffs must show that Defendant Akron Board of Education established an official policy, or tolerated a custom within the school district that led to, caused, or results in the deprivation of a constitutionally protected right. *Claiborne,* 103 F.3d at 507 (citing *Monell,* 436 U.S. at 690–91, 98 S.Ct. 2018). The plaintiffs do not say that the Defendant Akron Board of Education had an explicit policy of condoning sexual abuse. No school board could have such a policy. Because the plaintiffs do not claim that the Akron Board adopted an official policy, they must show that a "custom" was adopted through the decision making process that led to Bennett abusing them. *See id.*

The plaintiffs say the Board of Education had a custom of failing to prevent sexual abuse by teachers after repeated notice of trouble with the teacher that should have suggested the teacher was a pedophile. To make this claim under § 1983 for Defendant Akron Board of Education's inaction, the plaintiffs must make the showing described by the Sixth Circuit:

> ... Doe claims that the custom was to fail to act to prevent the sexual abuse. To state a municipal liability claim under an "inaction" theory, Doe must establish: (1) the existence of a clear and persistent pattern of sexual abuse by school employees; (2) notice or constructive notice on the part of the School Board; (3) the School Board's tacit approval of the unconstitutional conduct, such that their deliberate indifference in their failure to act can be said to amount to an official policy of inaction; and (4) that the School Board's custom was the "moving force" or direct causal link in the constitutional deprivation.

*Id.,* 103 F.3d at 508.

Here, a reasonable jury could find the Akron Board of Education manifested a "policy" of deliberate indifference to sexual abuse of students by teachers or counselors. *See City of Canton, Ohio v. Harris,* 489 U.S. 378, 389, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). There are facts sufficient to support a jury in finding a deliberate indifference to Bennett's sexual abuse and harassment of students. These facts are sufficient to support a jury finding that such deliberate indifference reflects a custom of inaction that was a "moving force" in the constitutional deprivation. The

---

9. Although Bennett made contact with Plaintiff Devericks at college, the alleged phone harassment began while Devericks was a student at Firestone High School. In addition, Bennett used school facilities during work time to further his harassment of Devericks at his college.

plaintiffs show evidence that the Defendant Akron Board of Education tolerated a pervasive custom, which directly caused the deprivation at issue. *See Monell,* 436 U.S. at 690–91, 98 S.Ct. 2018; *City of St. Louis v. Praprotnik,* 485 U.S. 112, 121, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988); *Doe v. New Philadelphia Public Schools Bd. of Educ.,* 996 F.Supp. 741, 746 (N.D.Ohio 1998). Having so found, the Court denies Defendant Akron Board of Education's motion for summary judgment.

### D. State law claims

The plaintiffs also make pendent state law claims for negligence, negligent hiring, negligent infliction of emotional distress, stalking/harassment, and for loss of consortium. As to these, the Defendant Akron Board of Education argues it is immune under state and federal law.

The plaintiffs make claim that the Board of Education was negligent. Among other arguments, the defendant says it is immune from liability under Ohio's Revised Code, which provides in pertinent part:

For the purposes of this chapter, the functions of political subdivisions are hereby classified as governmental functions and proprietary functions. Except as provided in division (B) of this section, a political subdivision is not liable in damages in a civil action for injury, death, or loss to persons or property allegedly caused by any act or omission of the political subdivision or an employee of the political subdivision in connection with a governmental or proprietary function.

OHIO REV. CODE § 2744.02(A)(1) (Supp. 1999).[10]

■ As a general rule, a political subdivision is not liable in tort for injuries to persons or property that occur in connection with the performance of a governmental or proprietary function. *See Redd v. Springfield Twp. School Dist.,* 91 Ohio

App.3d 88, 91, 631 N.E.2d 1076 (9th Dist. 1993). This general rule of non-liability is subject to certain exceptions. The Ohio General Assembly has afforded five such exceptions, the relevant provision of which reads:

"(4)... [P]olitical subdivisions are liable for injury, death, or loss to persons or property that is caused by the negligence of their employees and that occurs within or on the grounds of buildings that are used in connection with the performance of a governmental function, including, but not limited to, office buildings and courthouses, but not including jails, places of juvenile detention, workhouses, or any other detention facility, as defined in section 2921.01 of the Revised Code."

OHIO REV. CODE § 2744.02(B) (Supp.1999).

■ The Defendant Akron Board of Education says this general immunity is subject only to the five exceptions to immunity listed in O.R.C. § 2744.02(B). *See Cater v. City of Cleveland,* 83 Ohio St.3d 24, 697 N.E.2d 610 (1998). The defendant argues that none of these exceptions apply here. More specifically, the defendant argues that the exception to immunity found in O.R.C. § 2744.02(B)(4) is limited to negligent acts associated with maintaining school buildings and grounds. *See, e.g., Zellman v. Kenston Bd. of Educ.,* 71 Ohio App.3d 287, 290, 593 N.E.2d 392 (11th Dist.1991). A review of Ohio law reveals a split among the state courts of appeals on this issue.

In *Marcum v. Talawanda City Schools,* 108 Ohio App.3d 412, 670 N.E.2d 1067 (12th Dist.1996), a student brought an action against a school district after being assaulted by other students. The student claimed a teacher had been negligent in leaving a meeting unattended. The Court of Appeals found that the exception to the

---

**10.** Defendant says the Ohio Supreme Court's decision in the recent case of *State ex. rel. Ohio Academy of Trial Lawyers v. Sheward,* 86 Ohio St.3d 451, 715 N.E.2d 1062 (1999) does not affect the applicability of Ohio's sovereign immunity. In that decision, the Ohio Supreme Court found Am.Sub.H.B. No. 350 to unconstitutionally violate the separation of powers.

general rule of non-liability established by § 2744.02(B)(4) was satisfied and allowed the case to go forward.

· Similarly, in *Williams By and Through Williams v. Columbus Board of Education*, 82 Ohio App.3d 18, 610 N.E.2d 1175 (10th Dist.1992), three male students encountered the plaintiff in a classroom in which she was working on a science project. They assaulted her both physically and sexually. The Court of Appeals for Franklin County allowed the case to go forward, finding the injury occurred in the school building, which is a building used in connection with the performance of a governmental function, within the meaning of § 2744.02(B)(4). *See Williams*, 82 Ohio App.3d at 22, 610 N.E.2d 1175; *see also Hubbard v. Canton City School Bd. of Educ.*, 1998 WL 753253 (Ohio App. 5 Dist. Oct 26, 1998) (NO.1998CA00089).

Other Ohio courts of appeal have found that § 2744.02(B)(4) only applies to the maintenance of governmental property. *See, e.g., Zellman v. Kenston Bd. of Educ.*, 71 Ohio App.3d 287, 593 N.E.2d 392 (11th Dist. 1991); *Doe v. Jefferson Area Local School District*, 97 Ohio App.3d 11, 646 N.E.2d 187 (1994) (school board is immune from negligent hiring and supervision claims).

In the absence of clear direction from the Ohio Supreme Court,[11] this Court must determine which of the lines of authority from the state courts is more persuasive. Upon consideration, this Court finds the cases holding that school districts are not immune to be more persuasive. The statute specifies that political subdivisions are liable for negligence occurring within or on the grounds of the relevant government building. The Defendant's argument for an interpretation going beyond the terms of the statute is not persuasive.

■ The Board of Education contends that even if its immunity is stripped under § 2744.02(B), another section of the Ohio code provides an alternative source of immunity. Under § 2744.03(A), the Board has immunity for its exercise of discretion in using personnel, unless the conduct is of a certain type:

> The political subdivision is immune from liability if the injury, death, or loss to persons or property resulted from the exercise of judgment or discretion in determining whether to acquire, or how to use, equipment, supplies, materials, personnel, facilities, and other resources, *unless the judgment or discretion was exercised with malicious purpose, in bad faith, or in a wanton or reckless manner.*

Ohio Rev.Code § 2744.03(A) (Supp.1999) (emphasis added). Therefore, the plaintiffs can succeed only if they can show the Board acted with malice, in bad faith, or in a wanton or reckless manner. On the facts presented thus far, the Court finds there is sufficient evidence to raise a genuine issue of material fact whether the Board so acted.

### III. CONCLUSION

For the reasons explained herein, the Court denies Defendant Akron City Board of Education's motions for summary judgment in these three related cases.

IT IS SO ORDERED.

---

**11.** With regard to *Hubbard*, the Ohio Supreme Court has accepted a discretionary appeal, finding a conflict exists with *Doe v. Jefferson Area Local School District*, 97 Ohio App.3d 11, 646 N.E.2d 187 (1994), and *Zellman v. Kenston Board of Educ.*, 71 Ohio App.3d 287, 593 N.E.2d 392 (1991). The consolidated appeal will consider the following issue: Is the exception to the political subdivision immunity found in Ohio Rev.Code § 2744.02(B)(4), effective 7/1/89, applicable only to negligence occurring in connection with the maintenance of school property or equipment, or to physical defects within or on the grounds of school property?