Daniel P. **KIELY**, Plaintiff,

v.

**HEARTLAND REHABILITATION SERVICES, INC., and Health Care and Retirement Corp., d/b/a Georgian Bloomfield Defendants.**

No. CIV. 01–40149.

United States District Court,
E.D. Michigan,
Southern Division.

March 8, 2005.

Charles M. Sirhal, Troy, MI, David J. Nickola, Nickola Assoc., Flint, MI, George La Plata, Alan R. Miller Assoc., Birmingham, MI, John D. Nickola, Flint, MI, Lawrence J. Bunting, Troy, MI, for Daniel P. Kiely, Plaintiff.

Karen B. Berkery, Kitch, Drutchas, (Detroit), Omar Weaver, Equal Employment Opportunity Commission, Detroit, MI, for Heartland Rehabilitation Services, Incorporated, Health Care and Retirement Corporation, dba Georgian Bloomfield, Defendants.

### ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

GADOLA, District Judge.

Plaintiff Daniel P. Kiely brings this action against his former employers, Defendants Heartland Rehabilitation Services, Inc., and the Health Care Retirement Corporation, claiming disability discrimination under the Michigan Persons with Disabilities Civil Rights Act ("PDCRA"), M.C.L. § 37.1101, *et seq.* Before the Court is Defendants' second motion for summary judgement, filed on July 9, 2004, for which the Court held a hearing on March 4, 2005. Because there exist genuine issues of material fact, the Court will deny Defendants' motion.

## I. Background

Plaintiff has been diagnosed with retinitis pigmentosa and macular dystrophy. Retinitis pigmentosa rendered him legally blind shortly before his 18th birthday and, over time, has restricted his peripheral vision to less than ten degrees in each eye and left him night blind. Plaintiff's remaining central vision has also suffered a loss due to macular dystrophy. Both retinitis pigmentosa and macular dystrophy are degenerative diseases that promise to rob Plaintiff of more and more of his sight. Plaintiff also suffered from cataracts in both of his eyes, but had them removed in October and November of 1999. Plaintiff is hearing impaired and has worn hearing aids since he was three years old; nevertheless, Plaintiff's hearing appears to be stable. In 1976, the Social Security Administration determined Plaintiff to be legally blind and has granted him disability benefits at various times.

Plaintiff worked for Defendants as a physical therapy assistant at the Georgian Bloomfield Nursing Home from April 19, 1995 until July 10, 1998. Defendants were aware of Plaintiff's disabilities when they hired him and yet considered him qualified. Furthermore, all four of Defendants' formal performance evaluations which Plaintiff received while employed by Defendant rated him as either "average" or "definitely above average."

Notwithstanding these favorable evaluations, Plaintiff's supervisor, Marcia Smith, fired Plaintiff on July 10, 1998 for the reason that he posed a safety threat to himself and others. During the termination interview, Ms. Smith cited five examples of incidents where Plaintiff threatened the safety of himself or others. Later, when Plaintiff requested a written expla-

nation for his termination, Sandy Arnold, Defendants' Human Resources Manager, sent Plaintiff a letter detailing the five examples:

Not seeing a unit manager while passing in a dimly lit, narrow hall, bumping shoulders with her and knocking her into a wall;

Placing a gait belt on a patient who already had a gait belt on top of his clothing; [1]

Asking where a patient was located, when in fact he was seated three feet in front of you in a wheelchair;

Wheeling a patient into the wrong room, not identifying [sic] that both beds were occupied, and needing to be made aware of that fact by a co-worker;

Coming out of the elevator wheeling a patient, not realizing that the wheels were stuck in a groove and continuing to attempt to push the chair until someone helped you.

Def. Ex. S.

Since the commencement of Plaintiff's lawsuit, Defendants produced numerous affidavits and statements of Plaintiff's supervisors and coworkers all claiming that Plaintiff had difficulties performing his duties in a safe manner because of his disabilities. In addition to the five examples above, the claims include that Plaintiff was incapable of performing as a "full team member;" that Plaintiff had difficulty seeing in hallways and patient rooms; that he needed dim light to avoid glare, which was contrary to the needs of the patients; that Plaintiff would bump into walls, equipment, and people because he could not see them; that he would fail to see things handed to him; that he was unable to maneuver in meeting rooms; that he had

**1.** Contrary to the rendition given by Ms. Arnold, both parties agreed at the hearing that the gait belt was actually underneath the patient's clothing, and that once this was discovered, Plaintiff quickly took off the second gait belt.

tripped over oxygen cords and neglected to notice that certain patients were attached to IV bags, catheters, or other tubes; and that some patients feared Plaintiff because he might bump or hit them due to his inability to see them. *See* Def. Exs. E, H, I, K, P and W.

Despite all of these claims, Defendants have produced no documentation made at the time of the alleged safety incidents, such as an incident report, a letter from a patient, or a formal counseling form. Furthermore, none of Plaintiff's evaluations make reference to any of the alleged incidents, or that Plaintiff posed any safety threat. Defendant, however, has produced the handwritten notes of Ms. Smith which she wrote in connection with a meeting with Plaintiff on January 27, 1998 after Ms. Smith observed Plaintiff having trouble navigating the physical therapy gym. The notes regard "recent concerns about [Plaintiff's] safety skills declining" and Plaintiff's "increase difficulty in visual skills during treatment times." Def. Ex. X. The notes state that Plaintiff explained that his cataracts were causing difficulties and that he had an appointment to have them checked in April. *Id.*

Defendants also claim to have provided Plaintiff with various accommodations. At Plaintiff's request, Defendants provided Plaintiff with the accommodation of limited bedside therapy work because of difficulty seeing in the patients' rooms. Defendants claim that they provided Plaintiff with other accommodations on their own initiative. They rearranged the physical therapy gym; assigned Plaintiff to easier, higher functioning patients; allowed Plaintiff to perform therapy in dimly lit halls; and limited his patient transportation duties. *See* Def. Exs. H, P, K. Defendants claim that all of these accommodations were ineffective in helping Plaintiff perform his duties.

The physicians who have examined Plaintiff appear to be split as to whether Plaintiff could perform his job. Dr. Scarf thought that the "care of the patients or other individuals where observation is required and where he would be responsible for their general safety and well being, could not be performed safely, given the visual limitations Mr. Keily has." Def. Ex. N at 4. Though, Dr. Scarf did opine that Plaintiff could perform sedentary tasks, "which involve physical contact and manipulation in familiar surroundings and in a controlled environment.... This latter type of activity could include some of the work and tasks performed in physical therapy." *Id.* On the other hand, it was the opinion of Dr. Cohn, Plaintiff's treating physician, that "[w]ith appropriate accommodations for his disabilities, he can satisfy requirements of the job description for Physical Therapist. Such accommodations might include a cooperative staff/management/patient work environment, adequate lighting, and mutual agreement with fair consideration." Def. Ex. O. Dr. Stone, Plaintiff's prior treating physician, wrote a letter dated September 2, 1998 in which he stated that he felt convinced that Plaintiff was able to perform his job duties on a full-time basis. Def. Ex. F at 34, 39. Dr. Stone, however, admitted that his opinion was not based on any objective evaluation but solely on Plaintiff's representation to him that Plaintiff could complete his job duties. *Id.* at 37–39. Dr. Mobley, Plaintiff's cataract surgeon, declined to express an opinion regarding Plaintiff's ability to perform his job, though he did think it would be difficult for Plaintiff to live independently. Def. Ex. G at 33–34.

Plaintiff's complaint alleged disability discrimination under both Title VII of the Federal Civil Rights Act of 1964, 42 U.S.C. § 2000a, *et seq.,* and the Michigan PDCRA, M.C.L. § 37.1101, *et seq.* On

July 15, 2002, the Court granted Defendants' first motion for summary judgment and dismissed both claims. The Title VII claim was dismissed on the ground that Title VII does not prohibit discrimination on the basis of disability or seniority. The Michigan PDCRA claim was dismissed on the ground that Plaintiff was estopped from asserting the claim based on his inability to explain an apparent inconsistency between the Michigan PDCRA claim, which requires him to be able to perform the essential functions of his job, and his averment in a social security disability application that he was still disabled and "unable to work because of [his] disabling condition." *See* Opinion and Order (July 15, 2002).

Plaintiff appealed the dismissal of his Michigan PDCRA claim, but not the dismissal of his Title VII claim. On appeal, the Sixth Circuit found that Plaintiff did indeed offer an adequate explanation of the inconsistency and vacated the grant of summary judgment. *Kiely v. Heartland Rehab. Servs.*, 359 F.3d 386, 389–91 (6th Cir.2004). They declined, though, to evaluate the record for a determination of whether it presented a genuine issue of material fact, wishing instead to give this Court the first opportunity. *Id.* at 391.

Consistent with the Sixth Circuit's opinion, this Court extended the deadline for the filing of dispositive motions to allow the parties the opportunity to test whether there exists a genuine issue of material fact with respect to Plaintiff's one remaining claim under the Michigan PDCRA. Defendants, then, filed the motion now before the Court.

## II Standard of Review

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). Summary judgment is appropriate if the moving party demonstrates that there is no genuine issue of material fact regarding the existence of an essential element of the nonmoving party's case on which the nonmoving party would bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Martin v. Ohio Turnpike Comm'n*, 968 F.2d 606, 608 (6th Cir.1992).

In considering a motion for summary judgment, the Court must view the facts and draw all reasonable inferences in a light most favorable to the nonmoving party. *60 Ivy St. Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir.1987). The Court is not required or permitted, however, to judge the evidence or make findings of fact. *Id.* at 1435–36. The moving party has the burden of showing conclusively that no genuine issue of material fact exists. *Id.* at 1435.

A fact is "material" for purposes of summary judgment if proof of that fact would have the effect of establishing or refuting an essential element of the cause of action or a defense advanced by the parties. *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir.1984). A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Accordingly, when a reasonable jury could not find that the nonmoving party is entitled to a verdict, there is no genuine issue for trial and summary judgment is appropriate. *Id.; Feliciano v. City of Cleveland*, 988 F.2d 649, 654 (6th Cir.1993).

Once the moving party carries the initial burden of demonstrating that there are no genuine issues of material fact in dispute, the burden shifts to the nonmoving party to present specific facts to prove that there is a genuine issue for trial. To create a genuine issue of material fact, the nonmoving party must present more than just some evidence of a disputed issue. As the United States Supreme Court has stated, "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the [nonmoving party's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505 (citations omitted); *see Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548; *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

■ Consequently, the nonmoving party must do more than raise some doubt as to the existence of a fact; the nonmoving party must produce evidence that would be sufficient to require submission of the issue to the jury. *Lucas v. Leaseway Multi Transp. Serv., Inc.,* 738 F.Supp. 214, 217 (E.D.Mich.1990) (Gadola, J.), *aff'd,* 929 F.2d 701 (6th Cir.1991). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505; *see Cox v. Ky. Dep't of Transp.,* 53 F.3d 146, 150 (6th Cir.1995).

### III. Analysis

■ The burden of proving a violation of the PDCRA is on the Plaintiff. *Peden v. City of Detroit,* 470 Mich. 195, 204, 680 N.W.2d 857 (2004). "To prove a discrimination claim under the [PDCRA], the plaintiff must show (1) that he is handi-capped as defined in the act, (2) that the handicap is unrelated to his ability to perform his job duties, and (3) that he has been discriminated against in one of the ways delineated in the statute." *Chmielewski v. Xermac, Inc.,* 457 Mich. 593, 602, 580 N.W.2d 817 (1998). The act defines disability as

A determinable physical or mental characteristic of an individual, which may result from disease, injury, congenital condition of birth, or functional disorder, if the characteristic ... substantially limits 1 or more of the major life activities of that individual and is unrelated to the individual's ability to perform the duties of a particular job or position or ... to the individual's qualifications for employment or promotion.

M.C.L. § 37.1103(d). Regarding the second element, that the handicap must be unrelated to his ability to perform his job duties, the act provides that " '[u]nrelated to the individual's ability' means, with or without accommodation, an individual's disability does not prevent the individual from ... performing the duties of a particular job or position." M.C.L. § 37.1103(*l*). Finally, regarding the last element, that the discrimination be one of the ways delineated in the statute, the PDCRA provides:

(1) Except as otherwise required by federal law, an employer shall not:

\*　　\*　　\*　　\*　　\*　　\*

(b) Discharge or otherwise discriminate against an individual with respect to compensation or the terms, conditions, or privileges of employment, because of a disability or genetic information that is unrelated to the individual's ability to perform the duties of a particular job or position.

M.C.L. § 37.1202.

■ That Plaintiff has established the first and third elements is undisputed.

Plaintiff is disabled under the act and Defendants terminated his employment on account of his disabilities. What is in dispute is the second element: whether Plaintiff's handicap was unrelated to his ability to perform his job duties, that is to say, whether Plaintiff's disabilities prevented him from performing his job duties.

Defendants maintain that they are entitled to summary judgment because Plaintiff cannot establish this second element, which is essential to a prima facie case of a PDCRA violation. Specifically, Defendants claim that Plaintiff is unable to perform the essential functions of his job in a safe manner. The thrust of Defendants' argument is that it is a "[q]ualification standard ... that an individual shall not to pose a direct threat to the health and safety of other individuals in the workplace. 42 U.S.C. 12113(b). Direct threat means a significant risk to the health and safety of others that cannot be eliminated by reasonable accommodation." [2] *Collins v. Blue Cross Blue Shield,* 228 Mich.App. 560, 570, 579 N.W.2d 435 (1998).

Given the facts of the case, Defendants' position is quite formidable. Yet, Defendants did not consider Plaintiff a threat to safety when they hired him, when they knew of his disabilities. None of Plaintiff's evaluations mention that he was a threat to safety or that he could not perform the essential functions of his job. In fact, Plaintiff's July 19, 1995 evaluation stated that Plaintiff "Interacts well with patients, families, and co-workers," that he is "Dependable, reliable," and a "Team player, displays a positive attitude." Pl.Ex. 7. His April 17, 1996 evaluation stated that Plaintiff has a "Good rapport with patients, families, [and] staff". *Id.* His April 19, 1997 evaluation stated that Plaintiff was a "Great team member" and "has good rapport" with patients and families. *Id.* Plaintiff's April 19, 1998 evaluation, which was performed by Ms. Smith less than four months before Plaintiff was terminated, stated that Plaintiff was "Timely with documentation" and had "Good rapport with staff, families, [and] patients." *Id.*

As for the overall evaluation, all evaluations rated Plaintiff as either "Doing an average job," or "Definitely above average." Plaintiff's April 19, 1998 evaluation, which, again, was completed by Ms. Smith less than four months before his termination, rated Plaintiff as "Doing an average job." In the category of physical fitness, all of Plaintiff's evaluations rated Plaintiff at either "Meets the physical and energy requirements," or is "Energetic; seldom tires." In the category of accuracy, Plaintiff rated either "Usually accurate; makes only average number of mistakes," or "Requires little supervision; is exact and precise most of the time." In all of his evaluations Plaintiff rated "Usually takes care of necessary tasks and completes with reasonable promptness" for dependability and "volume of work is satisfactory" for quantity of work. *Id.*

In addition to these facts are the opinion of Plaintiff's treating physician, that Plaintiff could satisfy the requirements of his job with accommodations, and Plaintiff's own statements denying Defendants' claims that he posed a safety risk. *See* Def. Ex. B. Taken together, the Court finds that Plaintiff has established a genuine issue of material fact regarding whether his disabilities were unrelated to his ability to perform his job duties.

Defendants attempt to counter Plaintiff's satisfactory evaluations with state-

**2.** Defendants' argument relies on Americans with Disabilities Act case law, which Defendants apply to the PDCRA by analogy.

ments by Ms. Smith who stated that the April 19, 1998 performance evaluation she gave Plaintiff was "mediocre when compared to all of the other evaluations I gave other physical therapy assistants." Def. Ex. H at 4. Ms. Smith also stated that she did not reference any counseling sessions on Plaintiff's performance evaluation because that is not the purpose of the evaluation. Def. Ex. M at 13. At the hearing, Defendants claimed the Ms. Smith did not address Plaintiff's disabilities or any safety concerns because Plaintiff's disabilities are not something that can be improved and any such reference would impact negatively on his salary and promotional opportunities.

The Court finds it curious that Defendants would not address their concerns regarding Plaintiff's abilities on a detailed evaluation form specifically used to evaluate an employee's abilities. Regardless, it is not up to the Court to decide the merits of Defendants' explanation. Defendants' attack on Plaintiff's performance evaluations, and Ms. Smith's contradictions, do nothing more than create a factual issue for the jury to decide, which jury might believe the evaluations and not Defendants' rebuttal, or vice versa.

 Finally, Defendants claim that Plaintiff has failed to mitigate his damages. However, "a claimant required to make reasonable efforts to mitigate damages is not held to the highest standards of diligence.... The claimant's burden is not onerous, and does not require him to be successful in mitigation." *Morris v. Clawson Tank Co.*, 459 Mich. 256, 264, 587 N.W.2d 253 (1998) (quoting *Rasheed v. Chrysler Corp.*, 445 Mich. 109, 123, 517 N.W.2d 19 (1994)) (internal quotations omitted). From the date of his termination until November 2, 2001, Plaintiff sent out 50 resumes, obtained four interviews, and employed the services of a

headhunting firm. Whether this effort constitutes sufficient mitigation of damages is a genuine issue of material fact and "the question whether an employee was reasonable in not seeking or accepting particular employment is one to be decided by the trier of fact." *Id.* at 266, 587 N.W.2d 253 (quoting *Rasheed*, 445 Mich. at 124, 517 N.W.2d 19).

## IV Conclusion

Because there exist genuine issues of material fact regarding whether Plaintiff's disabilities were unrelated to his ability to perform his job duties and whether Plaintiff adequately mitigated his damages, the Court will deny Defendants' motion.

**ACCORDINGLY, IT IS HEREBY ORDERED** that Defendants' motion for summary judgment [docket entry 80] is **DENIED.**

**SO ORDERED.**